EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| Municipio de Loíza<br>      Demandantes-Reconvenidos<br>     Apelante-Recurrente<br><br><br><br>             v.<br><br>Sucesiones de Marcial Suárez y de Encarnación<br>Fuentes, etc.<br>     Demandados-Reconvenientes<br>     Apelados-Recurridos | Certiorari<br><br>2001 TSPR 84 |

Número del Caso: CC-1999-833

Fecha: 11/junio/2001

Tribunal de Circuito de Apelaciones:
                        Circuito Regional VII


Juez Ponente:
                        Hon. Andrés E. Salas Soler

Abogado de la Parte Recurrente:
                        Lcdo. Francisco San Miguel Fuxench

Abogados de la Parte Recurrida:
                        Lcdo. A. J. Bennazar Zequeira
                        Lcda. Ana M. Niggemann García
                        Lcda. Laura González Lugo

Materia: Revisión Administrativa



     Este documento constituye un documento oficial del Tribunal Supremo que está
     sujeto a los cambios y correcciones del proceso de compilación y publicación
     oficial de las decisiones del Tribunal. Su distribución electrónica se hace
     como un servicio público a la comunidad.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Municipio de Loiza

     Demandantes-Reconvenidos
     Apelante-Recurrente

       Vs.                           CC-1999-833

SUCESIONES DE MARCIAL SUÁREZ Y
DE ENCARNACIÓN FUENTES,
Compuestas por SURIMA SUÁREZ
CESTERO y OTRAS PARTES
     Demandados-Reconvenientes
     Apelados- Recurridos

Opinión del Tribunal emitida por el Juez Asociado señor FUSTER BERLINGERI

San Juan, Puerto Rico, a 11 de junio de 2001.

Tenemos la ocasión para determinar, *inter alia*, cuándo se requiere una declaración de impacto ambiental con relación a un proyecto de extracción de arena.

## I.

La Sucesión Marcial Suárez (Sucesión) es dueña de una finca de aproximadamente 57 cuerdas en el Barrio Medianía Baja del Municipio de Loíza. La Sucesión interesa desarrollar un proyecto de viviendas denominado "Lagos del Palmar", que incluye la construcción de un lago artificial que ocuparía gran parte del terreno, y que requeriría la

extracción de arena y material de la corteza terrestre en un área de más de dieciocho cuerdas. El proyecto está ubicado cerca de otros seis cuerpos de agua **que fueron creados con propósitos similares, aunque nunca se construyeron los proyectos de vivienda propuestos.**

El 4 de noviembre de 1994 la Sucesión presentó una consulta de ubicación ante la Junta de Planificación, en la que describió el proyecto propuesto como un condominio residencial-vacacional con acceso controlado, que incluía, con el propósito de "realzar el proyecto", un lago artificial al cual todas las viviendas tendrían acceso directo.[1] El 22 de diciembre de 1994 el Departamento de Recursos Naturales y Ambientales (en adelante Departamento de Recursos Naturales) le comunicó al Secretario de la Junta de Planificación que, por "la magnitud del área a desarrollarse y el impacto potencial de la excavación de arena para la construcción del lago artificial, donde se afectará el nivel freático del lugar", debía solicitarle al proponente la preparación de una Declaración de Impacto Ambiental. Sin esgrimir fundamento alguno para ello, la parte proponente solicitó una reconsideración de tal decisión al Departamento de Recursos Naturales el 11 de enero de 1995. El 13 de enero de 1995 el Departamento de Recursos Naturales le comunicó que no tenía objeción al proyecto propuesto, pero que por estar ubicado en una zona susceptible de inundación (Zona II), debería cumplir con el Reglamento 13 de Planificación; y que para crear el lago en cuestión debía solicitar un permiso para la extracción de la corteza terrestre. Nada dispuso sobre la necesidad de realizar la Declaración de Impacto Ambiental que había requerido antes. La Junta de Planificación le comunicó el 21 de enero de 1995 a la Junta de Calidad Ambiental, mediante una Declaración de Impacto Ambiental Negativa, que no era necesaria la formulación de una Declaración de Impacto Ambiental ya que, de cumplir con las recomendaciones allí consignadas, el proyecto no causaría impacto ambiental adverso significativo. El 8 de febrero de 1995 la Junta de Calidad Ambiental le comunicó a la Junta de Planificación que entendía que al someter la referida Declaración de Impacto Ambiental Negativa dicha Junta de Planificación había cumplido con la fase de evaluar el posible impacto ambiental de la acción propuesta. La consulta fue aprobada, mediante resolución de la Junta de Planificación, el 22 de febrero de 1995. La Junta de Planificación consideró el proyecto como uno de desarrollo residencial extenso y dio su aprobación condicionada al cumplimiento de los señalamientos incluidos en los endosos de las diferentes agencias.

El 12 de julio de 1995 la Sucesión sometió ante el Departamento de Recursos Naturales un formulario de evaluación ambiental para la extracción de materiales de la corteza terrestre. No se celebraron vistas públicas, debido a que cuando se publicó el edicto anunciando la solicitud de permiso de extracción, nadie las solicitó. El 28 de diciembre

---

[1] Solicitaron varias concesiones sobre usos y construcciones no permitidas en los distritos clasificados como R-1: disminución en el ancho de las casas en hileras, construcción de cuatro edificios de apartamentos y de tres edificios comerciales.

de 1995, notificado el 17 de diciembre de 1996, el Departamento de Recursos Naturales otorgó un permiso al proyecto del caso de autos para la extracción de materiales de la corteza terrestre mediante el cual se autorizó la extracción de 600 metros cúbicos diarios durante un año a partir de la fecha de notificación del permiso, a la vez que se requirió una póliza de responsabilidad pública por un millón de dólares y una fianza de cumplimiento ("performance bond") para garantizar las labores de restauración por $879,000. El permiso de extracción contiene numerosas condiciones y limitaciones, tanto generales como especiales, como por ejemplo, que las dimensiones de la fosa a crearse no podrán exceder los cuatro pies de profundidad ni seis cuerdas de área de superficie. Además, se advierte que se evitará la formación de depresiones donde puedan crearse charcos o lagos por efectos de la operación o remoción del material adyacente al área de extracción autorizada. El 10 de diciembre de 1996 la Administración de Reglamentos y Permisos (ARPE) aprobó el permiso de urbanización, sujeto a varias condiciones, entre las que se especificó que la extracción de tierra para la creación del lago sería solicitada y autorizada mediante un permiso de uso de la ARPE, el cual sería evaluado y estaría sujeto al endoso final del Departamento de Recursos Naturales. Finalmente, el 17 de diciembre de 1996 la ARPE aprobó el permiso de uso para realizar operaciones de extracción de arena.

El Departamento de Recursos Naturales recibió entonces múltiples querellas de los vecinos sobre los permisos de extracción, por lo que comenzó una etapa investigativa y se celebró una vista pública el 20 de marzo de 1997. El 6 de junio de 1997, ya comenzado el procedimiento judicial que nos ocupa, el Departamento de Recursos Naturales emitió una orden de cese y desista contra la sucesión querellada y le ordenó que mostrara causa por la cual no debía revocar o enmendar el permiso de extracción que dicha agencia había otorgado antes.

El 22 de abril de 1997 el Municipio de Loíza presentó una petición de *injunction* ante el Tribunal de Primera Instancia y alegó que los permisos otorgados por las agencias referidas resultaban ser un subterfugio para permitir extraer, vender y mercadear grandes cantidades de arena sin haberse realizado declaración de impacto ambiental alguna y sin que las agencias concernidas hubiesen evaluado el impacto acumulativo que el lago artificial pudiese causar en la zona. El Municipio señaló que la obra propuesta ocasionaría "grandes daños al balance ecológico del área y a nuestros recursos naturales, en perjuicio de nuestro patrimonio estatal y en perjuicio de los Loiceños, quienes habitan y tienen su residencia en dicho lugar". Alegó, además, la violación de las condiciones de los permisos, la irreparabilidad del daño ambiental ocasionado por la parte demandada en la referida finca y que no existía otro remedio adecuado en ley para compeler a la parte demandada a desistir de su plan de construcción. Solicitó al tribunal que le ordenara a la parte demandada paralizar todas las actividades de extracción de materiales de la corteza terrestre en la finca en cuestión.

La parte demandada presentó oportunamente su contestación a la acción del Municipio. Alegó afirmativamente que tenía todos los permisos gubernamentales necesarios para efectuar un desarrollo de vivienda con el nombre "Lago del Palmar", incluyendo un permiso para la extracción de materiales de la corteza terrestre otorgado por el Departamento de Recursos Naturales. Expresó que la parte demandante tuvo oportunidad de oponerse por la vía administrativa al proyecto y no lo hizo, por lo que no podía ahora atacar colateralmente el permiso concedido. A su vez, los demandados reconvinieron contra el Municipio por los daños alegadamente sufridos por la acción de los demandantes de bloquear la entrada de la finca con el propósito de impedir el tránsito de los camiones cargados de arena.

Luego de celebrar una vista para considerar la petición de *injunction* el 12 de mayo de 1997, el Tribunal de Primera Instancia emitió una orden paralizando provisionalmente la extracción de arena por el término de 10 días. Posteriormente, se celebraron las vistas pertinentes, así como una inspección ocular en el lugar del proyecto, y entonces el tribunal declaró con lugar la demanda de *injunction* preliminar el 30 de mayo de 1997. En sus determinaciones de hecho el tribunal consignó que el Municipio de Loíza había sido objeto de una remoción indiscriminada de arena, lo que había dado lugar a que en el año 1978 se prohibiera por quince años toda extracción de arena en ese sector hasta el año 1995, año en que se otorgó el permiso del caso de autos. Estableció que estas actividades habían dejado la costa expuesta a los embates del mar, al oleaje y susceptible a inundaciones cuando hay fenómenos atmosféricos fuera de lo normal. Añadió que:

> A pesar de tratarse de un proyecto de vivienda, al tribunal no le queda la menor duda de que la actividad principal y de mayor interés y prioridad para los proponentes es la extracción de arena resultante del lago el cual limita impresionantemente el terreno disponible para las viviendas siendo necesario solicitar exenciones de requisitos de construcción para acomodar forzadamente un número de unidades aceptables reglamentariamente. Evidencia adicional de ello es el orden que se propone de las fases de desarrollo del proyecto y la configuración conceptual del mismo y la notable ausencia de detalles sobre planos, costos, estudio de viabilidad además de la separación financiera de la operación de extracción y el proyecto de construcción, según información ofrecida por la proponente durante la inspección ocular.

También quedó demostrado para el Tribunal que con respecto a este proyecto no se había realizado declaración de impacto ambiental alguna, ya que según el testimonio de la parte proponente "se le había eximido" de ello. Al respecto el tribunal de instancia expresó:

> [...] Se dio por cumplido el requisito del Art. 4(c) de la Ley de Política Pública Ambiental mediante un formulario ambiental caracterizado como deficiente e incompleto que depende de la información que buenamente ofrece el proponente. Tampoco se produjo un documento de evaluación ambiental formal en sustitución de la D.I.A. Curiosamente la Junta de Planificación produjo una D.I.A. negativa para el proyecto de vivienda y remitió al Departamento de Recursos Naturales el asunto del lago. Este a su vez descansó en las aprobaciones de la Junta de Planificación y en resumidas cuentas, al fragmentar el proyecto, no se evaluó adecuadamente ni por una ni por otra agencia en su impacto integral y acumulativo; ello en contravención a las expresas disposiciones reglamentarias. (Énfasis en el original.)

Concluyó, por lo tanto, que no se había cumplido con los requisitos de ley y que las partes no tenían ningún otro remedio en ley. El tribunal de instancia concedió el remedio preliminar solicitado, aun cuando el Municipio no había objetado el proyecto en etapas

previas. Para ello, el foro de instancia tomó en consideración la necesidad de poner en balance los diferentes intereses presentes, y la obligación constitucional de proteger el ambiente. Dictó sentencia prohibiendo cualquier extracción de arena en el Municipio de Loíza en los sesenta días siguientes y ordenó al Departamento de Recursos Naturales que paralizara todo permiso de extracción vigente. Ordenó, además, al Departamento de Recursos Naturales a remitirle al tribunal sus hallazgos, conclusiones y recomendaciones, con copia de la evaluación ambiental o declaración de impacto ambiental. Dispuso que una vez el tribunal aprobase el informe, los demandados podrían reanudar sus actividades conforme a lo dispuesto en los permisos, según pudiesen ser modificados por el tribunal. De esta resolución la Sucesión recurrió al Tribunal de Circuito de Apelaciones, el cual denegó expedir el recurso solicitado en esa etapa de los procedimientos, aunque le señaló al tribunal de instancia que debía "atender el asunto en forma separada de los trámites administrativos en los que la Sucesión obtuvo de la Junta de Planificación los correspondientes permisos."

Con el propósito de resolver la permanencia del *injunction*, el tribunal de instancia celebró posteriormente otras vistas en las que testificaron los peritos hidrólogos de las partes. A base de tales testimonios, el tribunal determinó que como el proyecto de extracción estaba localizado a una distancia de aproximadamente 900 metros de la orilla del mar y a más de 2,000 metros de los ríos Herrera y Grande de Loíza, el yacimiento de arena no se encontraba en la zona de transporte activo de dicho material ni cerca de ella. Concluyó que la alternativa generalmente aceptable para extracción de arena era en los depósitos lejos de las zonas sensitivas. A base de lo anterior, el tribunal descartó las alegaciones y conclusiones de los peritos de la parte demandante sobre el efecto adverso de la creación del lago en el área inundable y sobre la posible contaminación de los acuíferos subterráneos. Aunque en su informe al tribunal del 24 de julio de 1997 el Departamento de Recursos Naturales había expuesto que había "[...] recibido información que sugiere la posibilidad de que la actividad de extracción de arena en el Municipio de Loíza [cause] un daño irreparable al ambiente", el tribunal resolvió que no se había traído información ante el foro de instancia para sostener tal aseveración. El tribunal resolvió expresamente que "[a]nte la ausencia de prueba específica, científica, objetiva y confiable sobre daño ambiental irreparable, nos es forzoso desestimar la petición de *injunction* permanente." Finalizó su dictamen anunciando que "s[ó]lo serán el tiempo y el futuro [los] que nos demuestren la buena fe que hoy presumimos en la propuesta de este proyecto; buena fe que el Tribunal viene obligado a presumir pero que para la ciudadanía de Loíza será necesario demostrar..." Ordenó, además, que los planteamientos sobre la reconvención continuaran su curso en un procedimiento ordinario.

Inconforme, la parte demandante acudió el 25 de septiembre de 1997 al Tribunal de Circuito de Apelaciones y señaló, en parte, que el Tribunal de Primera Instancia había errado al no tomar en cuenta al desestimar su acción la totalidad de la prueba presentada

ni las leyes ambientales o el mandato constitucional que ordenan la protección del ambiente.[2] El Tribunal de Circuito de Apelaciones en su sentencia del 25 de agosto de 1999 advirtió que el recurso ante su consideración no podía interpretarse colateralmente como un recurso de revisión administrativa, ya que el Municipio había tenido oportunidad de intervenir en los procedimientos ante las agencias y no lo había hecho. Luego de analizar la prueba pericial presentada, concluyó que el formulario de evaluación ambiental que se utilizó para el caso era el que estaba vigente en el Departamento de Recursos Naturales para la fecha en que se gestionó el permiso, y que "a la concesionaria no se le requirió una Declaración de Impacto Ambiental porque tenía una consulta de ubicación ya aprobada que incluía un lago recreativo." El foro recurrido recalcó que según el testimonio del entonces Secretario del Departamento de Recursos Naturales, no se había requerido una Declaración de Impacto Ambiental por ser un "permiso incidental que venía de otra agencia." Luego de considerar los argumentos de los demandantes, confirmó la sentencia de instancia por estimarla correcta.

El Municipio de Loíza oportunamente solicitó revisión ante nos el 3 de noviembre de 1999, señalando la comisión de los siguientes errores:

1- Erró el Honorable Tribunal Apelativo al confirmar al Tribunal de Instancia y sostener que este no tenía que considerar los hechos determinados en su sentencia inicial del 30 de mayo de 1997.

2- Erró el Honorable Tribunal Apelativo al no decidir que el permiso de construcción de los recurridos es un subterfugio utilizado para el beneficio de los recurridos a pesar de las serias dudas que tienen tanto el tribunal de instancia como el propio tribunal apelativo.

3- Erró el Honorable Tribunal Apelativo al concurrir con el tribunal de instancia en no permitir que el Departamento de Recursos Naturales presentara el informe previamente requerido por el tribunal de instancia, cuando debió haber devuelto el caso y solicitar que el Departamento de Recursos Naturales efectuara el mismo.

4- Erró el Honorable Tribunal Apelativo al determinar que el tribunal de instancia no abusó de su discreción al limitar el contrainterrogatorio de un perito.

En síntesis, se cuestionan ante nos las determinaciones de los tribunales *a quo* a la luz de la totalidad de la evidencia presentada a través del trámite judicial y a la luz de las dudas expresadas por ambos tribunales sobre la finalidad de la extracción de arena y la legitimidad de los permisos utilizados para llevarla a cabo.

---

[2] Alegó, en esencia, que había errado el tribunal de instancia al emitir una sentencia contradictoria a la emitida por ese mismo foro anteriormente; al permitir que el Departamento de Recursos Naturales incumpliera con la orden de someter un informe que ilustrara al tribunal; al limitar el contrainterrogatorio del perito de los demandados a una hora; al contratar un perito pagado por las partes sin conocer sus cualificaciones y experiencias; al emitir su dictamen basado en la prueba parcial y no en la totalidad de toda la prueba presentada, y al no considerar en sus conclusiones de derecho la Ley de Política Pública Ambiental, la Constitución del Estado Libre Asociado de Puerto Rico y el Reglamento para Regir la Extracción de la Corteza Terrestre promulgado por el Departamento de Recursos Naturales.

El 16 de diciembre de 1999 expedimos el recurso. La parte recurrente presentó su alegato el 28 de enero de 2000, y la parte recurrida presentó el suyo el 25 de febrero de 2000.[3] Con el beneficio de ambas comparecencias, procedemos a resolver.

## II.

A la luz de nuestra Constitución y de la legislación aplicable, nos toca resolver si la parte demandada puede llevar a cabo las actividades de extracción de arena en cuestión al amparo de un permiso otorgado sin el beneficio de análisis ambiental alguno.

## A.

La Constitución de Puerto Rico establece que "será política pública del Estado Libre Asociado la más eficaz conservación de los recursos naturales, así como el mayor aprovechamiento de los mismos para el beneficio general de la comunidad...".[4] Hemos reiterado que tenemos la encomienda de rango constitucional de velar por la preservación de la calidad del ambiente y sus recursos naturales cuya importancia no podemos menospreciar. Misión Industrial de P.R., Inc. y otros v. Junta de Planificación de P.R. y otros, res. el 21 de marzo de 1997, 142 D.P.R.___, 97 JTS 34; Paoli Méndez v. Rodríguez, 138 D.P.R. 449 (1995); Colón

---

[3] En su alegato, la parte recurrida alega que tiene todos los permisos pertinentes; que el Municipio no expresó reparo alguno en torno al proyecto, a pesar de haber sido notificado; que las agencias, excepto el Departamento de Recursos Naturales, no fueron hechas partes en el pleito ni fueron debidamente emplazadas; que los trámites administrativos eran finales y nunca se cuestionó la determinación de que no era necesaria una Declaración de Impacto Ambiental; que no se probaron los supuestos daños ambientales; que no hay ningún subterfugio detrás del permiso de extracción de arena, pues el mismo se otorgó con fines comerciales, y que los peritos de los peticionarios cometieron ciertos errores crasos que invalidan sus conclusiones.

[4] Sección 19 del Artículo VI de la Constitución del Estado Libre Asociado de Puerto Rico.

v. Méndez, Departamento de Recursos Naturales, 130 D.P.R. 433 (1992). Al amparo de dicho mandato se promulgó la Ley sobre Política Pública Ambiental, Ley Núm. 9 de 1 de junio de 1970, 12 L.P.R.A. sec. 1121, según enmendada, (Ley Núm. 9), la cual "constituye el primer y principal esquema estatutario adoptado en Puerto Rico para atender de modo integral los asuntos concretos que se plantean en el país en relación con la administración del medio ambiente." Misión Industrial de P.R. Inc. y otros v. Junta de Calidad Ambiental de P.R. y otros, res el 29 de junio de 1998, 145 D.P.R. ___, 98 T.S.P.R. 85, 98 JTS 77.

Todos los departamentos, agencias, corporaciones públicas, municipios e instrumentalidades del Estado Libre Asociado están obligados, según el Artículo 4 de la Ley Núm. 9, a interpretar, implementar y administrar todas las leyes y cuerpos reglamentarios del país "en estricta conformidad con la política pública enunciada". 12 L.P.R.A. sec. 1124; Misión Industrial de P.R. Inc. y otros v. Junta de Calidad Ambiental de P.R. y otros, supra. La Junta de Calidad Ambiental, creada mediante la Ley Núm. 9[5], es la agencia designada para velar por "el fiel cumplimiento de la política pública ambiental y [los] requisitos procesales y sustantivos contenidos en [la Ley Núm. 9] y los reglamentos aprobados a su amparo". García Oyola v. Junta de Calidad Ambiental, res. el 21 de febrero de 1997, 142 D.P.R. ___, 97

---

[5] 12 L.P.R.A. sec. 1129.

JTS 25; <u>Colón Cortés v. Junta de Calidad Ambiental</u>, res. el 2 de junio de 1999, 148 D.P.R.___, 99 T.S.P.R. 85, 99 JTS 91.

El Artículo 4(c) de la Ley Núm. 9, uno de sus pilares, impone a la instrumentalidad pública con jurisdicción sobre alguna propuesta la obligación de realizar una declaración escrita y detallada sobre el impacto ambiental antes de "efectuar cualquier acción o promulgar cualquier decisión gubernamental que afecte significativamente la calidad del medio ambiente". 12 L.P.R.A. sec. 1124, <u>Municipio de San Juan v. Junta de Calidad Ambiental</u>, res. el 14 de diciembre de 2000, 151 D.P.R. ___, 2000 T.S.P.R.___, 2000 JTS 193; <u>Federación de Pescadores de Playa Picúa v. Junta de Planificación</u>, res. el 27 de mayo de 1999, 148 D.P.R.___, 99 T.S.P.R. 82, 99 JTS 87; <u>Misión Industrial v. Junta de Calidad Ambiental</u>, <u>supra</u>; <u>García Oyola v. Junta de Calidad Ambiental</u>, <u>supra</u>; <u>Salas Soler v. Srio. de Agricultura</u>, 102 D.P.R. 716 (1974). En la sección 2 del Reglamento se define 'impacto ambiental significativo' como:

> El efecto substancial (positivo o negativo) de una acción propuesta sobre uno o varios elementos del ambiente, tales como, pero sin limitarse a[,] una población biótica, un recurso natural, el ambiente estético o cultural, la calidad de la vida, la salud pública, los recursos renovables y no renovables; o que pueda sacrificar los usos beneficiosos del ambiente a largo plazo a favor de los usos a corto plazo o viceversa, disponiéndose que cada uno de los elementos aquí enumerados será evaluado independientemente y en conjunto.

En términos de las actividades que requieren la preparación de una Declaración de Impacto Ambiental, hemos interpretado que la frase "cualquier acción", para los efectos de la Ley Núm. 9, denota la intención de incluir una amplia gama de actividades que puedan causar impacto sobre el medio ambiente, entre ellas, "actividades de expedir licencias, concesiones o permisos".[6] <u>Federación de Pescadores de Playa Picúa v. Junta de Planificación</u>, <u>supra</u>; <u>Municipio de San Juan v. Junta de Calidad Ambiental</u>, <u>supra</u>; véase la Sección 2 del Reglamento sobre las Declaraciones de Impacto Ambiental[7]. Incumplir con la Declaración de Impacto Ambiental que requiere la <u>National Enviromental Policy Act</u>[8] (N.E.P.A. por sus siglas

---

[6] Así pues, hemos establecido que es necesario preparar Declaraciones de Impacto Ambiental si se anticipa un impacto ambiental significativo, en específico, al promulgar reglamentos (<u>Salas Soler v. Secretario de Agricultura</u>, <u>supra</u>; <u>Federación de Pescadores de Playa Picúas v. Junta de Planificación</u>, <u>supra</u>), y al solicitar permiso o renovación de permiso para remover la corteza terrestre (<u>Díaz Álvarez v. Departamento de Recursos Naturales</u>, res. el 26 de enero de 1999, 147 D.P.R. ___, 99 T.S.P.R. 7, 99 JTS 6).

[7] En dicho Reglamento se define 'acción' como: "La toma de decisiones o cualquier otro tipo de actividad que auspicie, fomente o proponga una agencia del Estado Libre Asociado de Puerto Rico, tales como, actividades de: expedir licencias, concesiones o permisos, reglamentar o formular normas, asignar o liberar fondos, realizar cambios sustanciales en la política pública de las agencias y sus programas, aprobar proyectos a través de permisos o cualquier otra decisión reguladora, zonificar, rezonificar y presentar propuestas de legislación. Entendiéndose que cuando el tomar la decisión o implantar la acción en cuestión, envuelva a más de una agencia, la misma se denominará acción multiagencial."

[8] 42 U.S.C.A. secs. 4321-4370.

en inglés) se considera de por sí un daño irreparable.[9] <u>Misión Industrial de P.R., Inc. y otros v. Junta de Planificación de P.R. y otros</u>, <u>supra</u>, citando a <u>Puerto Rico Conservation Foundation v. Larson</u>, 797 F. Supp. 1066, 1072 (D. Puerto Rico 1992).

El artículo 4(c) tiene el propósito dual de que la "agencia proponente considere a fondo las consecuencias ambientales significativas de la acción o proyecto que contempla", y de que "se informe a las partes concernidas, al propio Gobierno y al público en general de las consecuencias ambientales aludidas, para que todos ellos puedan tomar la acción que estimen procedente sobre el proyecto propuesto". <u>Misión Industrial de P.R. v. Junta de Calidad Ambiental</u>, <u>supra</u>. Por medio de la Declaración de Impacto Ambiental, nuestro ordenamiento jurídico provee un mecanismo que nos ayuda a asegurar la conservación y el uso racional de los recursos naturales. "[E]s un instrumento de planificación, la primera etapa de un largo camino de autorizaciones oficiales en el desarrollo de un proyecto." <u>Municipio de San Juan v. Junta de Calidad Ambiental</u>, <u>supra</u>; <u>Misión Industrial v. Junta de Calidad Ambiental</u>, <u>supra</u>. Dicho documento debe prepararse "**<u>antes</u>** de que se efectúe cualquier acción gubernamental que pueda impactar el medio ambiente", para que efectivamente se tome "en cuenta al momento de hacer planes y de **<u>tomar las primeras decisiones gubernamentales sobre una propuesta</u>**..." (Énfasis en el original.) Aun así, la aprobación de una Declaración de Impacto Ambiental no significa una carta blanca sobre lo ambiental. Si resulta que una vez comenzado el proyecto el mismo no se desarrolla según la Declaración de Impacto Ambiental o si surgen consecuencias ambientales no previstas, la Junta de Calidad Ambiental tiene la facultad y el deber de "tomar todas las medidas adecuadas para evitar cualquier daño al ambiente o a los recursos naturales que pueda por ello ocurrir, y el hecho de que la Junta haya aprobado antes una declaración de impacto ambiental en modo alguno impide que tome tales medidas". <u>Misión Industrial v. Junta de Calidad Ambiental</u>, <u>supra</u>.

El artículo 4(c) establece que en la declaración que emita la agencia proponente se debe detallar:

> (1) El impacto ambiental de la legislación propuesta, de la acción a efectuarse o de la decisión a promulgarse;

---

[9] En <u>Municipio de San Juan v. Junta de Calidad Ambiental</u>, <u>supra</u>, indicamos: "Al redactarse la Ley sobre Política Pública Ambiental, <u>supra</u>, se utilizó como modelo el esquema federal del "National Environmental Policy Act" (NEPA)[...] En consecuencia, hemos resuelto que las interpretaciones judiciales de la ley federal resultan persuasivas y pueden ayudar en la interpretación de alguna sección de la ley local. A tales efectos en <u>Misión Ind. P.R. v. J.C.A.</u> [...] expresamos que, "en vista de [que la Ley Núm. 9 se tomó en su mayor parte, casi literalmente, de la National Environmental Policy Act de 1969, 42 USCA 4321 et seq.] debemos referirnos a tal legislación federal, y a la jurisprudencia que ésta ha generado, como fuentes importantes para la interpretación de nuestra propia ley."
Sin embargo, también hemos aclarado que el uso de tales fuentes federales debía estar en "armonía con las exigencias de la política ambiental que fija nuestra Constitución, con el historial y sentido de nuestra propia Ley 9, y con las realidades particulares de Puerto Rico...."(Citas omitidas.)

(2) cualesquiera efectos adversos al medio ambiente que no podrán evitarse si se implementare la propuesta legislación, si se efectuare la acción o promulgare la decisión gubernamental;

(3) alternativas a la legislación propuesta, o a la acción o decisión gubernamental en cuestión;

(4) la relación entre usos locales a corto plazo del medio ambiente del hombre y la conservación y mejoramiento de la productividad a largo plazo, y

(5) cualquier compromiso irrevocable o irreparable de los recursos que estarían envueltos en la legislación propuesta si la misma se implementara, en la acción gubernamental si se efectuara o en la decisión si se promulgara. 12 L.P.R.A. sec. 1124.

En otras palabras, en la Declaración de Impacto Ambiental la agencia proponente tiene la obligación de considerar y detallar por escrito los efectos significativos con respecto al ambiente que estén vinculados a la acción propuesta, como parte de "**un esfuerzo serio y escrupuloso por identificar y discutir todas las consecuencias ambientales de importancia que sea previsibles**". Misión Industrial v. Junta de Calidad Ambiental, supra. Le corresponde a la Junta de Calidad Ambiental examinar la declaración sometida por la agencia proponente y verificar que se haya cumplido con los requisitos procesales y sustantivos fijados por la Ley Núm. 9. García Oyola v. Junta de Calidad Ambiental, supra; Misión Industrial v. Junta de Calidad Ambiental, supra. Entre las consideraciones que se deben tomar en cuenta al momento de preparar una Declaración de Impacto Ambiental, están los pasos que pudiesen ser tomados para mitigar las consecuencias adversas que generaría la acción propuesta (Misión Industrial v. Junta de Calidad Ambiental, supra), las alternativas que cumplan con las metas del proyecto (Municipio de San Juan v. Junta de Calidad Ambiental, supra) y el efecto acumulativo de la acción sobre el medio ambiente (Díaz Álvarez v. Departamento de Recursos Naturales, res. el 26 de enero de 1999, 147 D.P.R. ___, 99 T.S.P.R. 7, 99 JTS 6).

Para hacer valer la obligación de la agencia proponente bajo la Ley Núm. 9, la parte afectada tiene disponible el recurso de _mandamus_[10] y el recurso de _injunction._ Colón Cortés v. Junta de Calidad Ambiental, supra.

En aras de detallar el procedimiento de preparación de las declaraciones de impacto ambiental, la Junta de Calidad Ambiental promulgó el Reglamento sobre las Declaraciones de Impacto Ambiental del 1 de junio de 1984 (en adelante Reglamento) y el Manual para la Preparación, la Evaluación y el Uso de las Declaraciones de Impacto Ambiental del 4 de junio de 1984 (en adelante Manual).[11] La Sección 3.1 del Reglamento dispone que el primer paso es la preparación de una Evaluación Ambiental para "que la agencia proponente determine si se requiere la preparación de una DIA Preliminar o una

---

[10] Según lo establece el artículo 20 de la Ley Núm. 9.

[11] "El propósito de este Reglamento es el de establecer los requisitos procesales y de contenido necesarios para la debida implantación del art. 4 de la ley sobre Política Pública Ambiental, según enmendada, y cumplir así con los objetivos de dicha ley." Sección 1.2(c) del Reglamento.

Determinación de Impacto Ambiental No-Significativo (D-N)."[12] Si determina que la acción propuesta no afectará significativamente el ambiente, la agencia proponente lo consignará en una Declaración de Impacto Ambiental No Significativo que deberá cumplir con los requisitos de la Sección 4 del Reglamento.[13] La Declaración de Impacto Ambiental Preliminar (DIA-Preliminar) es la declaración de impacto ambiental "que será preparada por la agencia proponente para consultar y obtener los comentarios del público, la Junta de Calidad Ambiental y las agencias comentadoras respecto a la acción propuesta".[14] En los próximos 60 días luego de que se reciban los comentarios sobre la DIA Preliminar, la agencia proponente deberá preparar una Declaración de Impacto Ambiental Final "en la cual discuta los comentarios hechos por cada una de las agencias consultadas, por el público y por la Junta, y donde se expongan las modificaciones a la acción propuesta que se estimen necesarias en virtud de dichos comentarios".[15]

**B.**

Examinemos ahora las disposiciones aplicables a las actividades de extracción. El artículo 6 (c) de la Ley Orgánica del Departamento de Recursos Naturales y Ambientales, 3 L.P.R.A. sec. 151 y ss, le confiere al referido departamento los poderes, facultades, funciones y actividades sobre la extracción de materiales de la corteza terrestre que anteriormente ostentaba el Secretario de Trasportación y Obras Públicas.[16] La Ley de Arena, Grava y Piedra, Ley Núm. 132 del 25 de junio de 1968, según enmendada, 28 L.P.R.A. secs. 206 et seq. (Ley de Arena, Grava y Piedra), regula lo pertinente a excavaciones, extracciones, remociones y dragados de la corteza terrestre. Establece que para realizar actividades de extracción en Puerto Rico se requiere un permiso del Secretario del Departamento de Recursos Naturales (en adelante Secretario). El artículo 2 de la Ley dispone, en parte, que:

> El Secretario establecerá por reglamento las normas a regir cuando se trate de excavaciones, extracciones, remociones o dragados incidentales a, o

---

[12] Se tendrá que preparar una evaluación ambiental, según la Sección 3.2, a menos que de antemano la agencia proponente establezca la necesidad de una Declaración de Impacto Ambiental, cuando la acción a tomarse sea: "(a) Una acción para la cual la agencia proponente tiene duda, no ha determinado si será necesario o no preparar una DIA.
(b) Similar a una de las que normalmente requieren una DIA, pero circunstancias especiales podrían causar el que no ocurra impacto ambiental significativo.
(c) Similar a una de las que normalmente no requieren una DIA, pero circunstancias especiales podrían ocasionar el que ocurriere algún impacto ambiental significativo."
[13] Sobre el deber de la Junta de Calidad Ambiental de determinar si el contenido de la Declaración no significativa es adecuado, véase T-JAC, Inc. v. Caguas Centrum Limited Partnership, S.E. y otros, res. el 12 de abril de 1999, 148 D.P.R. ____, 99 T.S.P.R. 54, 99 JTS 60, a la pág. 889.
[14] Sección 2.1 del Reglamento.
[15] Sección 5.5(14) del Reglamento.
[16] 3 L.P.R.A. sec. 156(c) y 28 L.P.R.A. sec. 206.

necesarios para la realización de obras o proyectos autorizados conforme a las disposiciones de ley. [...]

El Secretario requerirá a todo peticionario una Evaluación Ambiental o una Declaración de Impacto Ambiental (DIA) antes de otorgar cualquier permiso, excepto para aquellos peticionarios que soliciten en la zona costanera y en las cuencas hidrográficas
de ríos que se utilizan como toma de agua. En estos casos se le requerirá la preparación de una Declaración de Impacto Ambiental (DIA). 28 L.P.R.A. sec. 207.

Al momento de solicitarse el permiso de extracción o la renovación de un permiso, se notificará al público y, de surgir controversias u objeciones en torno a alguna solicitud, el Secretario celebrará vistas públicas de naturaleza cuasi judicial. 28 L.P.R.A. sec. 208. El artículo 4 de la referida Ley especifica cuáles son los factores que hay que tomar en consideración al otorgar o denegar permisos. 28 L.P.R.A. sec. 209. Además, el artículo 17 establece una acción civil al amparo de la Ley de Arena, Grava y Piedra a favor de cualquier persona afectada por una actividad de excavación, extracción, remoción o dragado de componentes de la corteza terrestre en contra de cualquier persona, instrumentalidad, agencia, municipio, corporación pública o cuasi pública que viole la Ley, o en contra del Secretario si incumple las obligaciones que le impone la Ley.

Al amparo de la Ley de Arena, Grava y Piedra, el Secretario promulgó el "Reglamento para Regir la Extracción de Materiales de la Corteza Terrestre", Reglamento Núm. 2305 del 4 de noviembre de 1977 (en adelante Reglamento Núm. 2305), en el que se detalla lo que deben contener las solicitudes y el procedimiento administrativo para la otorgación y renovación de permisos, así como los derechos a pagar para la concesión del permiso y las fianzas y seguros que se deben exigir. El artículo 18 dispone que el Secretario eximirá de permisos:

a– Cuando la extracción a realizar se lleve a cabo en el mismo lugar y que sea incidental a una obra, proyecto o construcción que haya sido autorizado, conforme lo disponen las leyes y reglamentos que rigen el desarrollo de terrenos en Puerto Rico.

b– Cuando la extracción a realizar sea necesaria como consecuencia de fenómenos naturales tales como derrumbes, deslizamientos, inundaciones, tormentas u otros.

c– Cuando la extracción a realizar sea necesaria para el desarrollo y las prácticas agrícolas.

d– Cuando las cantidades a extraer no sean significativas o sustanciales, pudiendo también eximir de cualquier pago que en virtud de ello corresponda.

El 26 de marzo de 1993 el Departamento de Recursos Naturales promulgó la Orden Aministrativa Núm. 2-93 para establecer la política pública sobre la conservación de los recursos de arena en Puerto Rico. En ésta se expresa una preocupación seria por los problemas que ha sufrido el país en el manejo del recurso de arena y cómo ello ha afectado el equilibrio dinámico entre el abastecimiento y la demanda de arena en la Isla. Mediante la orden referida se incorporan unas recomendaciones de la Junta de Calidad Ambiental para definir la política pública que deberán ejecutar los funcionarios del Departamento de Recursos Naturales, entre las que se incluye que se requerirá "antes

de aprobar cualquier actividad de extracción o manufactura de arena que se cumpla (sic) el Artículo 4(c) de la [Ley Núm. 9]" y que se controlará "la extracción de grava y arena de las llanuras y valles aluviales aledaños a los ríos para eliminar o reducir la proliferación de lagos, lagunas o charcas mediante el requerimiento de rellenar las excavaciones hasta una elevación de (1) metro sobre el nivel del agua subterránea". El Departamento de Recursos Naturales también emitió el 23 de julio de 1993 la orden administrativa 93-12 para exigir el cumplimiento con el Artículo 4(c) de la Ley Núm. 9, de manera que en casos de solicitud de extracción de arena se realice una Evaluación de Impacto Ambiental y una Declaración de Impacto Ambiental o una Declaración de Impacto Ambiental No Significativo, según proceda. Al respecto, en Díaz Álvarez v. Departamento de Recursos Naturales, supra, expresamos que "[n]o hay duda de que la intención de tal Orden fue poner en vigor las disposiciones de la Ley Sobre Política Pública Ambiental al máximo grado posible en las actividades de extracción de corteza terrestre." En ese caso dispusimos que aún en ausencia de Orden Administrativa que ordene la confección de la declaración de impacto ambiental, la Ley Núm. 9 y los reglamentos relacionados imponen sobre el Departamento de Recursos Naturales la obligación de cumplir con el Artículo 4(c) de la referida ley antes de conceder un permiso de extracción o renovarlo.

El 23 de septiembre de 1997 la Asamblea Legislativa aprobó la Resolución Conjunta Núm. 398 con el propósito de declarar una moratoria en la otorgación de permisos de extracción de arena en el Municipio de Loíza y dejar en suspenso los permisos vigentes, hasta que se realizara un estudio del impacto ambiental que han tenido las actuales extracciones en el referido municipio.[17] En la Exposición de Motivos se señaló que muchas de las actividades de extracción "están contribuyendo al deterioro del ambiente y de la salud en Loíza". En virtud de que "[e]l Municipio de Loíza ha sido uno de los pueblos más afectados por las extracciones de arena" y de que "[s]e necesitan crear unos controles más rigurosos que permitan amortiguar el daño ya existente en los recursos naturales del Municipio", se le dio un término de un año al Departamento de Recursos Naturales para realizar un estudio del impacto significativo de las extracciones en dicho Municipio y radicarlo en la Asamblea Legislativa.[18] El 6 de octubre de 1998 se aprobó la Resolución

---

[17]  1997 L.P.R. 2096.

[18]  El Tribunal de Circuito de Apelaciones le ordenó a las partes que mostraran causa por la cual ese foro no había perdido jurisdicción por haberse tornado académico el asunto en vista de la Resolución Conjunta 398 del 23 de septiembre de 1997. Ambas partes coincidieron en que la causa no se había tornado académica. Los demandantes porque los permisos no se estaban revocando por medio de la Resolución, sino que quedaban en suspenso, por lo que había gran probabilidad de que la conducta de la parte demandada que ellos objetaban (la extracción) se repitiese. La parte demandada argumentó que como había expirado la moratoria, el pleito tenía tanta actualidad como cuando se inició. El tribunal apelativo ordenó la continuación de los procedimientos.

Conjunta Núm. 519[19] para extender por un plazo adicional de un año la moratoria declarada por la anterior resolución, a los fines de darle oportunidad al Departamento de Recursos Naturales de completar el estudio para determinar los impactos que las extracciones pasadas y presentes han tenido en el Municipio de Loíza. Mediante esta resolución se limitó la moratoria a la zona costanera entre el Río Grande de Loíza y el Río Herrera, por ser ésta el área donde han ocurrido la mayoría de las extracciones en el referido municipio. Del texto de las resoluciones conjuntas citadas podemos concluir que el impacto de las extracciones de arena en grandes cantidades ha generado gran preocupación entre la población y en las diferentes ramas del gobierno.

Pasemos a analizar los méritos del caso ante nos a la luz de la normativa reseñada.

### III.

En el caso de autos, lo que nos ocupa no es la revisión de los trámites administrativos ante las agencias pertinentes. Los permisos que en su día fueron otorgados no fueron impugnados y son finales. Lo que estamos evaluando es si procede una petición de *injunction* para paralizar una obra propuesta con respecto a la cual se ha alegado que se están utilizando tales permisos como subterfugio para realizar actividades de extracción en cantidades industriales donde por ley no se permite.

Por estar íntimamente relacionados, discutiremos los primeros dos errores en conjunto. Para resolverlos, debemos determinar en primer lugar si los permisos con que cuenta la parte demandada les permiten realizar autenticamente la acción propuesta o si sólo son un artificio para evitar cumplir con las normas de protección ambiental pertinentes. Además, para determinar la procedencia del *injunction* solicitado, debemos examinar si en el expediente hay suficiente evidencia para concluir que existe la posibilidad de que la parte demandada cause un daño irreparable al llevar a cabo la extracción propuesta.

### A.

El Municipio de Loíza alega que según el Tribunal de Instancia determinó al otorgar el *injunction* preliminar que la actividad principal real del proyecto era la extracción de arena, debió otorgar el *injunction* permanente al haberse evidenciado que en este caso los demandados utilizaron el proceso de consulta de ubicación para el proyecto de viviendas como un medio para eludir el procedimiento ordinario de permiso de extracción de arena. De esta manera, arguye la parte demandante, la Sucesión se benefició al tener a la Junta de Planificación como agencia proponente, pues ésta determinó que no era necesaria una Declaración de Impacto Ambiental. Alega que en este caso no bastaba con un permiso de extracción incidental, sino que era necesario seguir el procedimiento ordinario y realizar

[19]   1998 L.P.R. 2876.

una Declaración de Impacto Ambiental para cumplir cabalmente con el mandato constitucional respecto a la política pública ambiental.

La Sucesión, por su parte, alega que no hay ningún subterfugio en este caso, ya que los permisos se obtuvieron mediante un trámite público del cual la parte demandante pudo haber participado y fueron otorgados con fines comerciales. Argumenta que la intención de extraer arena para venderla nunca fue un secreto ni debe interpretarse como algo sospechoso. Entiende que los tribunales *a quo* actuaron conforme a derecho, pues la parte demandante nunca probó los supuestos daños ambientales y su prueba pericial no era confiable.

Es preciso aclarar que aunque la concesión de un *injunction* preliminar dentro de una petición de *injunction* permanente no tiene otro propósito que conservar el status quo hasta que el caso principal se resuelva en los méritos, de modo que la autenticidad de la función judicial no quede en entredicho, ello no quiere decir que las determinaciones hechas por el tribunal de instancia al conceder el *injunction* preliminar deban ser descartadas posteriormente. Todo lo contrario, aunque esas determinaciones no obligan al tribunal al considerar el *injunction* permanente, deben ser evaluadas en conjunto con la totalidad de la prueba que desfiló ante el tribunal. [20]

Para resolver la controversia ante nos, primero debemos determinar si en el caso de autos era necesario obtener un permiso ordinario de extracción o bastaba con un permiso incidental al proyecto de vivienda. La Sucesión alega que se le requirió más de lo que por ley correspondía, ya que el Departamento de Recursos Naturales pudo no haberle tan siquiera requerido un permiso de extracción por tratarse de una extracción incidental al proyecto de vivienda. En el Reglamento Núm. 2305, según enmendado, se dispone que el Secretario podrá eximir de permisos de extracción en las siguientes circunstancias: si la extracción se lleva a cabo en el mismo lugar y es incidental a la obra, proyecto o construcción que haya sido autorizado conforme a la ley; si es necesaria como consecuencia de fenómenos naturales; si es para el desarrollo de actividades agrícolas, o si las cantidades a extraer no son significativas o sustanciales, en cuyo caso se puede eximir de cualquier pago que corresponda.[21]

En este contexto, una extracción incidental es sólo aquella que es accesoria o de menor importancia con relación a un proyecto de construcción. **En el caso de autos, de ninguna manera se puede interpretar que la propuesta extracción de 600 metros cúbicos de arena diarios, que equivalen 118,890 metros cúbico anuales, era una extracción accesoria o de menor importancia con relación al resto del proyecto**. Estamos ante la creación de un lago de 18 cuerdas

---

[20] Véase Misión Industrial de P.R., Inc. y otros v. Junta de Planificación de P.R. y otros, supra; David Rivé Rivera, Recursos Extraordinarios, 2da edición, 1996, págs. 45-47; José Cuevas Segarra, Tratado de Derecho Procesal Civil, Tomo II, 2000, pág. 1035.
[21] Artículo 18 del Reglamento 2305, según citado antes.

que ocuparía alrededor de un tercio de la finca en cuestión, cuyo producto de extracción sería utilizado con fines comerciales.  Además, para que el permiso de extracción incidental se conceda, el proyecto del cual la extracción resulta ser accesoria tiene que haber sido debidamente aprobado antes.  En este caso, el permiso de extracción de arena se aprobó por el Departamento de Recursos Naturales el 28 de diciembre de 1995, antes de que la ARPE aprobara el permiso de urbanización el 10 de diciembre de 1996. Si la aprobación del permiso incidental dependía de la aprobación del permiso para realizar el proyecto, no podía ser el primero en aprobarse ya que esto significa que se aprobó sin el beneficio del análisis ambiental realizado para aprobar el permiso del proyecto de vivienda.

En el caso de autos, procedía que la ARPE realizara el análisis ambiental del proyecto de vivienda, y que el Departamento de Recursos Naturales hiciera lo propio respecto al permiso de extracción de arena, de acuerdo al artículo 4(c) de la Ley Núm. 9, la Ley de Arena, Grava y Piedra y sus respectivos reglamentos. Aunque la construcción de viviendas y la extracción de arena se habrían de realizar en un mismo sitio, son actividades separadas y diferentes. Una tiene como propósito la construcción de un proyecto de vivienda, la otra la explotación de un recurso natural. Debieron evaluarse ambas actividades por separado y en conjunto, pero en este caso resulta que solamente una fue evaluada aisladamente sin que se considerara el impacto acumulativo de ambas. Como consecuencia de la fragmentación de los permisos, en este proyecto no se realizó una evaluación adecuada del impacto integral y acumulativo de toda la acción propuesta para un área ambientalmente sensible. Es impermisible tal resultado, especialmente tratándose de los recursos naturales que por mandato constitucional estamos obligados a proteger. Díaz Álvarez v. Departamento de Recursos Naturales, supra. Véase, además, lo dispuesto en Colón Cortés v. Pesquera, res. el 19 de abril de 2000, 150 D.P.R. ___, 2000 T.S.P.R. 60, 2000 JTS 72, sobre la necesidad de considerar el impacto acumulativo de la acción al momento de realizar un análisis ambiental.


**B.**

Una vez descartada la contención de los demandados de que no era necesario solicitar un permiso de extracción en el caso de autos, procede que examinemos si es necesario formular una Declaración de Impacto Ambiental dentro del trámite de la solicitud para un permiso de extracción. La parte demandada sometió un formulario de Evaluación de Impacto Ambiental (que el Tribunal de Instancia calificó como "deficiente e incompleto que depende de la información que buenamente ofrece el proponente") ante el Departamento de Recursos Naturales para el permiso de extracción. Por otro lado, la Junta de Planificación sometió una Declaración de Impacto Ambiental No Significativa para el proyecto de vivienda ante la Junta de Calidad Ambiental.

Las referidas agencias determinaron que no era necesario una Declaración de Impacto Ambiental por no haber impacto ambiental significativo. Ya antes hemos establecido que las 'actividades de expedir permisos' caen bajo las acciones en las que, según la Ley Núm. 9, se puede exigir la preparación de una Declaración de Impacto Ambiental.[22] Según el Reglamento, el efecto sustancial de una acción sobre uno o varios elementos del ambiente, tales como un recurso natural, la calidad de vida, la salud pública y los recursos renovables o no renovables, que pueda sacrificar los usos beneficiosos del ambiente a largo plazo a favor de los usos a corto plazo, cae bajo la definición de lo que es un 'impacto ambiental significativo'[23] a los fines de requerir la elaboración de una Declaración de Impacto Ambiental.

En la sentencia declarando con lugar el entredicho provisional, el Tribunal de Instancia reseñó todos los problemas que ha causado la remoción indiscriminada de arena en el Municipio de Loíza: terrenos perdidos al mar; una costa extremadamente expuesta y susceptible a inundaciones; y lagos abandonados que constituyen un peligro a la seguridad pública y a la salud. En la segunda sentencia, el tribunal no negó estos hallazgos, que son la mejor evidencia del impacto ambiental significativo que este tipo de actividad previsiblemente ha de causar.

Además, según la prueba presentada por los peritos ante el Tribunal de Instancia en la vista para el *injunction* permanente, también quedó establecido allí que la extracción propuesta en el caso de autos constituía una acción con un impacto ambiental significativo. El tribunal apelativo basó, en parte, su decisión en que la prueba técnica del Municipio de Loíza se había caracterizado por la falta de datos probados y por supuestos especulativos. Sin embargo, debe recordarse que en cuanto a la revisión de la prueba presentada por peritos, los tribunales revisores "tienen amplia discreción en la apreciación de la prueba pericial pudiendo, aún, adoptar su propio criterio en la apreciación o evaluación de la misma y hasta descartarla aunque resulte técnicamente correcta. (Citas omitidas.)" Dye-Tex de P.R. v. Royal Ins. Co., res. el 27 de marzo de 2000, 150 D.P.R. ___, 2000 T.S.P.R. 54, 2000 JTS 67.[24] En el caso de autos, varios testimonios periciales apoyan lo señalado por el foro de instancia en su primer dictamen. El testimonio de Ángel Román Mas, perito de los demandantes, abundó sobre el efecto de la creación del lago propuesto con respecto a la evaporación y permeabilidad del acuífero, en la calidad del agua y en la inundabilidad del área. El otro perito de los demandantes, el ingeniero Mariano Soriano, testificó que la finca está dentro de una zona costanera sensitiva que sufre de una erosión constante y que

---

[22] Véase Federación de Pescadores de Playa Picúa v. Junta de Planificación, supra; Municipio de San Juan v. Junta de Calidad Ambiental, supra; Díaz Álvarez v. Departamento de Recursos Naturales, supra; Sección 2 del Reglamento sobre Declaraciones de Impacto Ambiental.

[23] Sección 2 del Reglamento.

[24] Como tribunal apelativo, estamos en las mismas condiciones que el tribunal de instancia para evaluarla y llegar a nuestras propias conclusiones. Rodríguez Roldán v. Municipio de Caguas, 133 D.P.R. 694(1993).

los lagos creados ayudan a acelerar la fragmentación del terreno; que se está cambiando la hidrología y la hidromorfología del lugar con el posible efecto de que se cree un área perennemente inundable, y que la charca propuesta era muy profunda, al punto de que se crearía una interfase entre el agua salada y el agua dulce. Despojados de tecnicismos, los testimonios evidencian las consideraciones científicas que se deben tomar en cuenta al analizar las ramificaciones ambientales de una actividad de extracción.

Los testimonios de los peritos, igualmente, reflejan que se trata de un área ambientalmente sensitiva que ha estado sujeta a impactos adversos en épocas recientes, por la remoción indiscriminada de arena, que es un recurso no renovable, a través de los años. Así lo evidencian las drásticas medidas que se han tomado en el pasado al decretar moratorias en la actividad de extracción, como se hizo en el 1978 (moratoria por quince años) y, más recientemente, en el 1997 (moratoria por un año, extendida durante otro año más) por medio de la Resolución Conjunta Núm. 398 del 23 de septiembre de 1997. Precisamente el lugar donde está situado el proyecto, la zona costanera entre los ríos Grande de Loíza y Herrera[25], fue señalado en la resolución Conjunta 519 del 6 de octubre de 1998 como el "área donde han ocurrido la mayoría de las extracciones de arena en el Municipio de Loíza" y es en esa zona que se extendió la moratoria durante un año más.

La extracción de arena de la corteza terrestre ha generado preocupación en varios sectores del gobierno, como evidencian las órdenes administrativas 93-2 y 93-12 del Departamento de Recursos Naturales que ya estaban en vigor en la época en que se otorgó el permiso de extracción. También obra en el expediente un Plan de Desarrollo de los Recursos de Arena de Puerto Rico sometido por el Secretario al Gobernador el 12 de junio de 1996, que refleja la preocupación imperante con la explotación de estos recursos naturales. Por ello, y según resolvimos en Díaz Álvarez v. Departamento de Recursos Naturales, supra, era necesario aquí que se otorgara el permiso en cumplimiento estricto con la Ley Núm. 9. Es decir, hacía falta presentar una Evaluación de Impacto Ambiental y preparar una Declaración de Impacto Ambiental si el impacto fuese significativo o una Declaración de Impacto Ambiental No Significativo de no serlo. El Formulario de Evaluación Ambiental para la Extracción de Materiales de la Corteza Terrestre que sometió la parte proponente ante el

---

[25] La zona costanera se define como: "Franja de terreno costanero y las aguas adyacentes a Puerto Rico y de las islas adyacentes dentro de su jurisdicción, delimitada por el Departamento de Recursos Naturales y aprobada por la Junta de Planificación y por el Gobernador de Puerto Rico, que se extiende mil (1,000) metros lineales tierra adentro desde la línea de costa y, además, distancias adicionales, hasta donde sea necesario para asegurar que se incluyan los sistemas naturales claves de la costa, así como las aguas y el suelo oceánico o marítimo que se extiende tres (3) leguas marinas (10.35 millas terrestres) aguas adentro." Reglamento de Zonificación de la Zona Costanera y Accesos a las Playas y Costas de Puerto Rico Núm. 17 del 3 de marzo de 1987, 23 R.P.R. secs. 650.3091 (47). El perito de la parte demandada testificó que el proyecto está a unos novecientos metros tierra adentro de la orilla del mar, y así lo consignó el tribunal de instancia en sus

Departamento de Recursos Naturales era insuficiente en términos de la Ley Núm. 9 como para considerarla como una evaluación ambiental formal, como bien estableció el Tribunal de Primera Instancia; y no cumplía con los requisitos de contenido de las Evaluaciones Ambientales que exige la Sección 3.3 del Reglamento.[26] Por lo tanto, el procedimiento que se realizó no era el requerido para expedir un permiso de extracción de arena para ese entonces.[27]

Por tener impacto ambiental significativo la acción propuesta, procedía preparar una Declaración de Impacto Ambiental para cumplir cabalmente con la política pública ambiental. Además, la Ley de Arena, Grava y Piedra, en el Artículo 2 anteriormente citado, dispone que en todo caso en que la actividad sea en la zona costanera, se requiere Declaración de Impacto Ambiental. Era necesario efectuar una Declaración de Impacto Ambiental dentro del procedimiento ordinario de solicitar un permiso de extracción antes de determinar la viabilidad de la acción, en la que se considerasen las alternativas, las medidas de mitigación y los efectos acumulativos, para tomarlas en cuenta *durante* el proceso de otorgación de permisos y así poder identificar las consecuencias ambientales previsibles. La Declaración de Impacto Ambiental es un instrumento de planificación que debe prepararse antes de efectuar cualquier acción gubernamental que pueda impactar el ambiente. Municipio de San Juan v. Junta de Calidad Ambiental, supra; Misión Industrial v. Junta de Calidad Ambiental, supra.

Por todo lo anterior, es forzoso concluir que la parte demandada no cuenta con un permiso adecuado para realizar una actividad de extracción de arena de la magnitud de la que se propone aquí. La parte proponente estaba obligada a solicitar un permiso de extracción. Para la concesión del permiso, por tratarse de una acción que conlleva un impacto ambiental significativo en área ambientalmente sensible en la zona costanera, había que realizar una Declaración de Impacto Ambiental. El permiso de construcción del proyecto de vivienda no se puede utilizar como pretexto para llevar a cabo la actividad de extracción para la cual la parte demandada no tiene permiso.

## c.

Debemos examinar la procedencia del *injunction* permanente como mecanismo procesal para un caso como el de autos. "El *injunction* es, por naturaleza, dinámico: "se caracteriza por su perentoriedad por su acción dirigida a evitar un daño inminente o a restablecer el régimen de ley conculcado por conducta opresiva, ilegal o violenta del

---

determinaciones de hecho, por lo que, según la definición, el proyecto está en la zona costanera.

[26] No cumple con todos los requisitos sobre la descripción de la ubicación propuesta y descripción de la acción propuesta.

[27] Nos causa cierta preocupación el hecho de que este caso ilustra cómo las agencias formulan una política pública por medio de reglamentos y órdenes administrativas, pero la misma no se llega a realizar ya que las referidas agencias fallan en la etapa de implantación de la política pública.

transgresor del orden jurídico." <u>Noriega Rodríguez v. Hernández Colón</u>, 130 D.P.R. 919 (1992), citando a <u>Peña v. Federación de Esgrima</u>, 108 D.P.R. 147, 154 (1978). A su vez, el *injunction* es un "remedio dinámico sobre el cual los tribunales siempre conservan jurisdicción para dejarlo sin efecto o modificarlo a favor o en contra del que resulta obligado". <u>Noriega v. Gobernador</u>, 122 D.P.R. 650, 688 (1988), citado en <u>Misión Industrial de P.R., Inc. y otros v. Junta de Planificación de P.R. y otros</u>, <u>supra</u>.

Este tribunal ha establecido que los criterios que se deben tomar en cuenta al decidir si concede o no un remedio provisional de *injunction* son: "la naturaleza de los daños que pueden ocasionárseles a las partes de concederse o denegarse el *injunction*; su irreparabilidad o la existencia de un remedio adecuado en ley; la probabilidad de que la parte promovente prevalezca eventualmente al resolverse el litigio en su fondo; la probabilidad de que la causa se torne en académica de no concederse el *injunction* y, sobre todo, el posible impacto sobre el interés público del remedio que se solicita." <u>P.R. Telephone Co. v. Tribunal Superior</u>, 103 D.P.R. 200, 202 (1975); <u>Municipio de Ponce v. Rosselló</u>, 136 D.P.R. 776 (1994); <u>Misión Industrial v. Junta de Planificación</u>, <u>supra</u>. "El *injunction* permanente también requiere la celebración de vista y la consideración de la mayor parte de estos criterios. Cf. <u>A.P.P.R. v. Tribunal Superior</u>, 103 D.P.R. 903, 906 (1975); véase D. Rivé Rivera, <u>El *Injunction* en Puerto Rico</u>, 53 Rev. Jur. U.P.R. 341, 354 y ss. (1984)." <u>Pueblo Int'l Inc. v. Rivera Cruz</u>, 117 D.P.R. 230 (1986).

Precisa conceder una petición de *injunction* permanente si la parte que lo solicita demuestra que no tiene ningún otro remedio en ley para evitar un daño[28]: "Procede un *injunction* para evitar daños irreparables o una multiplicidad de procedimientos. [Citas omitidas.] El concepto de evitación de daños irreparables o de una multiplicidad de procedimientos constituye un aspecto de la regla básica de que procede un *injunction* cuando el remedio existente en el curso ordinario de la ley es inadecuado." <u>Cruz v. Ortiz</u>, 74 D.P.R. 321 (1953).[29]

---

[28] Véase la opinión de conformidad en <u>Universidad del Turabo v. L.A.I.</u>, 126 D.P.R. 497 (1990).
[29] La Ley de Injunction dispone que:
"Puede concederse un injunction en los siguientes casos:
(1) Cuando resultare de la petición que el peticionario tiene derecho al remedio solicitado, y dicho remedio, o parte del mismo, consistiere en impedir la comisión o continuación del acto denunciado, bien por un período de tiempo limitado, o perpetuamente.
(2) Cuando de la petición o declaración jurada resultare que la comisión o continuación de algún acto, durante el litigio, habrá de causar pérdidas o daños de consideración o irreparables a alguna de las partes.
(3) Cuando, durante el litigio, resultare que una de las partes está cometiendo, o amenaza cometer, o que se dispone a cometer, o a procurar o permitir que se cometa, algún acto de contrario a los derechos de otra de las partes, con respecto al asunto en litigio y tendente a hacer que sea ineficaz la sentencia.
(4) Cuando una compensación pecuniaria no habría de proporcionar adecuado remedio.

"Sólo en raras ocasiones el daño ambiental puede ser adecuadamente compensado mediante la indemnización a obtenerse como resultado de una acción de daños y perjuicios. El carácter permanente de este tipo de daño lo hace generalmente irreparable.  Amoco Production Co. v. Village of Gambell, 480 U.S. 531, 545 (1987).  Por tales motivos, el incumplir con la declaración de impacto ambiental que requiere el *National Environmental Policy Act* (NEPA) es de por sí considerado un daño irreparable. Puerto Rico Conservation Foundation v. Larson, 797 F. Supp. 1066, 1072 (D. Puerto Rico 1992)." Misión Industrial de P.R., Inc. y otros v. Junta de Planificación de P.R. y otros, supra.  Si es así en la jurisdicción federal, mas aun en la nuestra, donde "la preservación de la calidad del medio ambiente es de rango constitucional y no puede ser menospreciada." Véase Misión Industrial de P.R., Inc. y otros v. Junta de Planificación de P.R. y otros, supra.

Por lo anterior, erraron tanto el tribunal de instancia como el apelativo al determinar que no procedía conceder el *injunction* ante la ausencia de prueba sobre daño irreparable.  El daño irreparable en el caso de autos quedó establecido, según discutimos anteriormente, ya que la parte demandada estaba realizando una actividad que conllevaba un impacto ambiental significativo sin el beneficio de análisis ambiental alguno según exigen los requisitos estatutarios de estirpe constitucional. La existencia de un daño irreparable, y el hecho de que la parte demandante no cuenta con ningún otro remedio en ley para obligar a los demandados a parar la extracción de arena para la cual no cuentan con los permisos, es suficiente en nuestro ordenamiento para otorgar el *injunction* permanente solicitado. No podemos olvidar que la Sección 19 del Artículo VI de la Constitución de Puerto Rico "no es meramente la expresión de un insigne afán, ni constituye tampoco sólo la declaración de un principio general de carácter exhortativo. Se trata, mas bien, de un mandato que debe observarse rigurosamente, y que prevalece sobre cualquier estatuto, reglamento u ordenanza que sea contraria a éste." Misión Industrial v. Junta de Calidad Ambiental, supra; Federación de Pescadores de Playa Picúa v. Junta de Planificación, supra; Colón Cortés v. Pesquera, supra.

## IV.

Todas las ramas del gobierno tienen la obligación de actuar de manera concertada al amparo de la política pública ambiental establecida en nuestra Constitución y velar por su fiel cumplimiento, especialmente las agencias del Gobierno a las cuales se les impuso tan vital encomienda por medio del artículo 4 de la Ley Núm. 9. Estamos llamados a establecer un balance entre las necesidades económicas de nuestra sociedad y la protección del medio ambiente, para que el progreso que alcancemos sea saludable en todos los aspectos.  Para

(5) Cuando fuere sumamente difícil precisar la cuantía de la compensación que habría de proporcionar remedio adecuado.
(6) Cuando la restricción fuere necesaria para impedir una multiplicidad de procedimientos judiciales.

lograr esto, lo mínimo que podemos exigir es el fiel cumplimiento de las disposiciones aplicables que, al fin y al cabo, nos protegen a todos y persiguen nuestro bienestar presente y futuro.

Con lo anterior disponemos de la controversia que nos ocupa, por lo que no es necesario discutir los demás errores.

Por los fundamentos expuestos, se revoca la sentencia del Tribunal de Circuito de Apelaciones del 25 de agosto de 1999 y la del Tribunal de Primera Instancia del 4 de agosto de 1997, y se ordena a la Sucesión la paralización definitiva de las actividades de extracción en el Municipio de Loíza hasta tanto consiga propiamente los permisos requeridos por ley.

Se dictará sentencia de conformidad.


JAIME B. FUSTER BERLINGERI
JUEZ ASOCIADO

---

(7) Cuando la obligación naciere de un fideicomiso." 32 L.P.R.A. sec. 3523.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Municipio de Loiza

    Demandantes-Reconvenidos
    Apelante-Recurrente

      Vs.                          CC-1999-833

SUCESIONES DE MARCIAL SUÁREZ Y
DE ENCARNACIÓN FUENTES,
Compuestas por SURIMA SUÁREZ
CESTERO y OTRAS PARTES
    Demandados-Reconvenientes
    Apelados- Recurridos

SENTENCIA

San Juan, Puerto Rico, a 11 de junio de 2001.

      Por los fundamentos expuestos en la Opinión que antecede, la cual se hace formar parte de la presente sentencia, se revoca la sentencia del Tribunal de Circuito de Apelaciones del 25 de agosto de 1999 y la del Tribunal de Primera Instancia del 4 de agosto de 1997, y se ordena a la Sucesión la paralización definitiva de las actividades de extracción en el Municipio de Loíza hasta tanto consiga propiamente los permisos requeridos por ley.

      Lo pronunció, manda el Tribunal y certifica la Secretaria del Tribunal Supremo. El Juez Asociado señor Corrada del Río concurre sin opinión escrita. El Juez Asociado señor Rivera Pérez disiente sin opinión escrita. El Juez Presidente señor Andréu García no interviene. El Juez Asociado señor Hernández Denton, inhibido.

Isabel Llompart Zeno
Secretaria del Tribunal Supremo