EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| Comité Pro Permanencia de la Barriada Morales, etc.<br><br>    Recurridos<br><br>        v.<br><br>Hon. William Miranda Marín Municipio de Caguas<br><br>    Peticionarios | Certiorari<br><br>2002 TSPR 138<br><br>157 DPR _____ |

Número del Caso: CC-2001-588

Fecha: 16 de octubre de 2002

Tribunal de Circuito de Apelaciones:
                    Circuito Regional VI

Juez Ponente:
                    Hon. Ismael Colón Birriel

Abogados de la Parte Peticionaria:
                    Lcdo. Pedro J. Varela Fernández
                    Lcdo. José R. Varela Fernández
                    Lcda. Carmen D. Longoria

Abogada de la Parte Recurrida:
                    Lcda. Blanca G. Trinidad Torres

Materia: Interdicto

Este documento constituye un documento oficial del Tribunal Supremo que está sujeto a los cambios y correcciones del proceso de compilación y publicación oficial de las decisiones del Tribunal. Su distribución electrónica se hace como un servicio público a la comunidad.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Comité Pro Permanencia
de la Barriada Morales, Etc.

    Recurridos

       vs.                        CC-2001-588      Certiorari

Hon. William Miranda Marín
Municipio de Caguas

    Peticionarios

Opinión del Tribunal emitida por el Juez Asociado señor Fuster Berlingeri.

San Juan, Puerto Rico, a 16 de octubre de 2002.

Tenemos la ocasión para interpretar varias disposiciones de la Ley de Municipios Autónomos, 21 L.P.R.A. Sec. 4001 *et seq*, según enmendada, a los fines de decidir si un alcalde puede disponer, **mediante una orden ejecutiva**, el cierre temporero de unas calles municipales en una situación como la del caso de autos.

I

El Municipio de Caguas inició un proyecto de construcción de viviendas y de infraestructura en la barriada Morales de esa ciudad. El proyecto incluía obras de demolición. Para facilitar la realización del proyecto referido, el Alcalde de Caguas emitió

varias ordenes ejecutivas en el año 2000 dirigidas a implantar unas medidas temporeras tales como limitar el flujo de vehículos de motor en las áreas de demolición y construcción, y cerrar los accesos a dichas áreas a través de dos calles municipales de la barriada. Las órdenes ejecutivas en cuestión tenían noventa días de vigencia, y fueron extendidas por un segundo término de noventa días.

El proyecto municipal referido había sido debidamente aprobado por la Junta de Planificación de Puerto Rico, conforme el Plan de Ordenación Territorial del Municipio adoptado por dicha Junta.

Así las cosas, un grupo de vecinos de la barriada Morales acudió al Tribunal de Primera Instancia, Sala Superior de Caguas, en una acción de *injunction*, y solicitó que se ordenara al Municipio de Caguas que dejara sin efecto el referido cierre de calles. Alegaron los vecinos, en esencia, que el cierre aludido les ocasionaba daños **por lo incómodo e inadecuado que era el flujo vehicular como resultado del cierre**. Uno de los vecinos, el Centro Evangélico Pentecostés, alegó incluso que el cierre en cuestión afectaba su libertad de culto debido a que sus feligreses tenían que utilizar la vía menos accesible para llegar a dicho Centro.

Como cuestión de derecho, el referido grupo de vecinos planteó que las órdenes ejecutivas en cuestión eran contrarias a la Ley de Municipios Autónomos, *supra.*

Luego de celebrar una vista para que las partes argumentaran sus respectivas posiciones, el 9 de febrero de 2001 el foro de

instancia dictó una **sentencia sumaria** y emitió un **interdicto permanente**. Ordenó al Alcalde de Caguas a eliminar de inmediato los obstáculos que impedían el libre acceso vehicular a la barriada Morales a través de las dos calles en cuestión. **En esencia, el foro de instancia determinó que el Alcalde carecía de facultad para ordenar el cierre de calles referido.**

El Alcalde y el Municipio de Caguas apelaron oportunamente el dictamen del foro de instancia, pero el 20 de junio de 2001 el Tribunal de Circuito de Apelaciones lo confirmó. Determinó, en esencia, que los apelantes no habían seguido el procedimiento establecido en la Ley de Municipios Autónomos para el cierre de carreteras, 21 L.P.R.A. Sec. 4465, por lo que el cierre en cuestión era ilegal. Dispuso también dicho foro que la Sec. 4465 referida aplicaba a cualquier cierre de accesos vehiculares, sin que importase que éste fuera **"de forma provisional o permanente"**.

El Alcalde y el Municipio de Caguas entonces recurrieron ante nos. Solicitaron que dejáramos sin efecto la orden de *injunction* emitida por el foro de instancia en el caso de autos, convalidada por el foro apelativo.

El 20 de julio de 2001 expedimos el recurso solicitado a fin de revisar la sentencia del foro apelativo de 20 de junio de 2001. El 11 de octubre de 2001 los peticionarios presentaron su alegato; los recurridos presentaron el suyo el 13 de noviembre de 2001. El 2 de julio de 2002 el Municipio y el Alcalde de Caguas comparecieron para informarnos que las obras de construcción a la barriada Morales continuaban afectadas por el *injunction* aun vigente, por lo que solicitaban que se resolviera este litigio

lo antes posible. Con el beneficio de todas estas comparecencias, pasamos a resolver.

II

Según formulada por los foros *a quo*, la cuestión principal en el caso de autos se reduce a determinar si el Alcalde de Caguas tenía facultad para disponer mediante orden ejecutiva el cierre temporero de dos calles de la barriada Morales del Municipio de Caguas, a fin de viabilizar unas obras de construcción y demolición del municipio en dicha barriada.

Ambos foros expresamente resolvieron que el Alcalde de Caguas no había seguido el procedimiento establecido por la Ley de Municipios Autónomos para el cierre de calles o carreteras, por lo que el cierre en cuestión había sido ilícito. Ambos foros se apoyaron en el Art. 9.016 de dicha Ley, según enmendada, 21 L.P.R.A. Sec. 4465, que en lo pertinente dispone lo siguiente:

### § **4465. Bienes municipales—Cierre de calles y caminos**

El municipio, tomando en consideración las recomendaciones de la Oficina de Ordenación Territorial, podrá ordenar y efectuar el cierre <u>**permanente**</u> de cualquier calle o camino dentro de sus límites territoriales, previa celebración de vista pública que deberá notificarse mediante avisos escritos fijados en sitios prominentes de la Casa Alcaldía y de la calle o camino a cerrarse. También se enviará una copia de dicho aviso al Secretario del Departamento de Transportación y Obras Públicas y a cada uno de los residentes y colindantes de la calle o camino de que se trate. La notificación para la vista pública se hará con no menos de diez (10) días de anticipación a la fecha dispuesta para su celebración y en la misma se incluirá una descripción breve de la calle o camino a cerrarse, la fecha, hora y lugar de la vista pública, así como una exhortación a los ciudadanos interesados para que participen en la referida vista.

Dicha vista deberá celebrarse ante una comisión, integrada por tres (3) funcionarios administrativos del municipio designados por el Alcalde. La Comisión rendirá un informe a la Asamblea, con sus conclusiones y recomendaciones, no más tarde de los treinta (30) días siguientes a la fecha en que haya concluido la vista pública. En la sesión ordinaria siguiente a la fecha que la Comisión presente su informe, la Asamblea, mediante resolución al efecto, determinará si se autoriza o no el cierre de la calle o camino de que se trate. (Énfasis suplido)

Según surge de modo palmario del texto antes citado de la referida sección 4465, el elaborado proceso que ésta establece para el cierre de calles o caminos, que el Alcalde de Caguas admitió no haber seguido, aplica al cierre **permanente** de calles o caminos, que es un asunto muy distinto al que aquí nos concierne. La disposición expresamente procura regular el cierre **permanente** de cualquier calle o camino municipal. El lenguaje utilizado en dicha disposición, cuyo claro tenor significa una clausura fija o firme de alguna vía, obviamente excluye medidas transitorias como las ordenadas aquí por el Alcalde. Sabido es que cuando la ley es clara, como lo es la disposición en cuestión, venimos obligados a observar su letra. Municipio de San Juan v. Banco Gubernamental, 140 D.P.R. 873 (1996); Ferretería Matos, Inc. v. P.R. Tel. Co., 110 D.P.R. 153 (1980); Caguas Bus Line v. Sierra, Comisionado, 73 D.P.R. 743, 750 (1952). Cuando la letra de la ley no tiene ambigüedades y su lenguaje es sencillo, como ocurre en el caso de autos, los tribunales no están autorizados a adicionarles limitaciones o restricciones que no aparecen de su texto. Román v. Superintendente de la Policía, 93 D.P.R. 685 (1966); Meléndez v. Tribunal Superior, 90 D.P.R. 656 (1964).

Mas aun, la intención legislativa detrás de lo dispuesto en la aludida Sec. 4465 es patente. Es evidente que un cierre permanente de una vía municipal tiene consecuencias y efectos de mucho mayor alcance que un mero cierre provisional para fines temporeros, como es el del caso de autos. Por ello, se justifica que para aquél la ley requiera seguir un procedimiento elaborado como el que establece la referida sección. Esa lógica legislativa, sin embargo, no es extensiva a un cierre transitorio como el que se impugna en el caso ante nos, que presenta una situación claramente distinguible de la de un cierre de calles **permanente**.

Erraron, pues, los foros *a quo* al evaluar el cierre del caso de autos al amparo de la referida sección. Por sus propios términos, que son patentemente claros, dicha sección sólo aplica a cierres permanentes.

III

Lo anterior nos lleva entonces a inquirir si el Alcalde tenía autoridad para ordenar el cierre temporero impugnado en el caso de autos.

No puede haber dudas que la acción en cuestión estaba avalada por la Ley de Municipios Autónomos, *supra,* con referencia a las disposiciones de ésta que establecen los poderes generales del municipio y de su primer ejecutivo. Veamos.

Por un lado, el Artículo 2.001(o) de la Ley Núm. 81 de 30 de agosto de 1991, según enmendada, 21 L.P.R.A. Sec. 4051, en lo pertinente dispone que: **"El municipio tendrá los poderes necesarios y convenientes para ejercer todas las facultades**

**correspondientes a un gobierno local y lograr sus fines y funciones**. Además de lo dispuesto en este subtítulo o en cualquier otra ley, los municipios tendrán los siguientes poderes:

\* \* \* \* \* \*

> (o) Ejercer el poder legislativo **y el poder ejecutivo en todo asunto de naturaleza municipal que redunde en el bienestar de la comunidad** y en su desarrollo económico, social y cultural, en la protección de la salud y seguridad de las personas, que fomente el civismo y la solidaridad de las comunidades y **en el desarrollo de obras y actividades de interés colectivo** con sujeción a las leyes aplicables." *Id.*

Por su parte el Artículo 3.009, incisos (a), (y) de la Ley Núm. 81 de 30 de agosto de 1991, según enmendada, 21 L.P.R.A. Sec. 4109, dispone que: **"el Alcalde será la máxima autoridad de la Rama Ejecutiva del gobierno municipal y en tal calidad le corresponderá su dirección, administración y la fiscalización del funcionamiento del municipio.** El Alcalde tendrá los deberes y ejercerá las funciones facultades siguientes:

> (a) Organizar, dirigir y supervisar todas las funciones y actividades administrativas del municipio.

\* \* \* \* \* \*

> (y) Ejercer todas las facultades, funciones y deberes que expresamente se le deleguen por cualquier ley o por cualquier ordenanza o resolución municipal **y las necesarias e incidentales para el desempeño adecuado de su cargo**." (Énfasis suplido)

Como puede observarse, las disposiciones citadas antes establecen amplios poderes generales tanto para el municipio como para su principal ejecutivo, a fin de que puedan tomar las medidas necesarias para realizar sus funciones respectivas y promover el bienestar de la comunidad municipal. Es evidente que en una pieza

legislativa como la Ley de Municipios Autónomos, *supra,* no pueden especificarse todos los poderes y facultades que tendrá el municipio y su Alcalde. La infinita variedad de situaciones que pueden surgir en los distintos municipios a través de los años requiere que en una ley como ésta se dispongan unos poderes generales que permitan abarcar todas las situaciones que puedan surgir que requieran acción gubernamental municipal. Por ello, hemos resuelto antes que los poderes y facultades conferidos a los municipios por la Ley de Municipios Autónomos deben interpretarse liberalmente, a fin de que las autoridades municipales puedan atender eficazmente las necesidades y el bienestar de sus habitantes. <u>Gobierno Municipal de Vega Baja v. Administración de Terrenos</u>, res. el 29 de junio de 2001, 2001 T.S.P.R. 101, 2001 JTS 104, 154 D.P.R. ___ (2001).

El citado Artículo 3.009(y) de la Ley de Municipios Autónomos, *supra*, expresamente dispone que el Alcalde puede ejercer no sólo todas las facultades que dicha Ley le otorga concretamente sino además las que sean **<u>necesarias e incidentales para el desempeño adecuado de su cargo</u>**. Ello evidentemente incluye la facultad de ordenar el cierre temporero de calles cuando tal cierre es necesario, como lo era en el caso de autos, para garantizar el bienestar y la seguridad de la comunidad mientras se realizaban unas demoliciones y se construían unas viviendas en un sector del Municipio.

Mas aun, la referida acción del Alcalde fue enteramente consistente con la facultad municipal que ya hemos reconocido de reglamentar el tránsito en las vías públicas. <u>López, Fed. Coms.</u>

Unidos v. Municipio de San Juan, 121 D.P.R. 75 (1988); Salas v. Municipio de Moca, 119 D.P.R. 625 (1987). Varias veces antes hemos resuelto que en el ejercicio del poder de razón de Estado, a los municipios se les reconoce la facultad de construir, mejorar y reconstruir obras públicas de todo tipo, y la de reglamentar el tránsito y el estacionamiento en sus vías públicas. Expresamente hemos señalado que **"los asuntos relacionados con obras públicas y tránsito se consideran principales manifestaciones del poder de policía del municipio"**. Salas v. Municipio de Moca, *supra*, pág. 630.

Con arreglo a todo lo anterior, pues, no hubo nada ilícito en la acción referida del Alcalde, por lo que erraron los foros *a quo* al decidir lo contrario.

IV

Existe otro asunto que también debemos traer a colación brevemente. En nuestro ordenamiento jurídico está bien establecido que al considerar la expedición del recurso extraordinario de *injunction* en casos como el de autos, los tribunales deben ponderar la naturaleza de los derechos individuales reclamados frente al valor y la utilidad social de la obra pública que se pretende paralizar. A.P.P.R. v. Tribunal Superior, 103 D.P.R. 903 (1975); Ortega Cabrera v. Tribunal Superior, 101 D.P.R. 612 (1973). El recurso puede expedirse si están presentes varias circunstancias especiales, una de las cuales es que el promovente haya sufrido o esté en riesgo de sufrir daños irreparables. Torres Bonet v. Asencio, 68 D.P.R. 208 (1948). Se trata de un aspecto de la norma medular más amplia de

que el *injunction* procede sólo cuando el remedio existente en el curso ordinario de la ley no proteja adecuadamente los derechos sustantivos del peticionario de una manera rápida y eficaz. Cruz v. Ortiz, 74 D.P.R. 321 (1953). Véase, además, Rivé, Recursos Extraordinarios, (1989) pág. 28. Para que se emita el *injunction* debe existir "un agravio de patente intensidad al derecho del individuo que reclame urgente reparación." No puede existir indefinición o falta de concreción en el derecho reclamado. Otero Martínez v. Gobernador, 106 D.P.R. 552 (1977).

En el caso de autos, el foro de instancia dictó un *injunction* **permanente** mediante **una sentencia sumaria**. En lo pertinente, dicho foro sólo tuvo ante su consideración las vagas alegaciones de los peticionarios de que el cierre de calles impugnado había ocasionado "inconvenientes y trastornos a la comunidad" porque la vía de acceso que tenían a la barriada después del cierre referido era la más "incomoda", la "menos accesible". Aparte de la esencial consideración de si las alegaciones referidas, de ser ciertas, eran de tal grave magnitud como para justificar el remedio interdictal, nos confrontamos aquí con el problema de que los promoventes del *injunction* en cuestión **no le presentaron al tribunal prueba alguna en apoyo de estas alegaciones**, más allá de una mera declaración jurada del presidente de grupo de vecinos en la que conclusoriamente éste reiteraba las alegaciones aludidas. Por el contrario, el foro de instancia tuvo ante sí una llamada "Estipulación de Hechos" sometida por los abogados de ambas partes, en la cual la única alusión al asunto medular de los daños alegadamente sufridos por los vecinos de la barriada

Morales era a los efectos de que **estaba en controversia si el cierre de los dos accesos en cuestión había trastocado la vida comunal de la barriada Morales**. Es decir, las partes acordaron que el asunto factual más importante de este pleito estaba en controversia. Quizás por lo anterior, en la sentencia sumaria dictada por el tribunal de instancia **no aparece ninguna determinación de hecho ni conclusión de derecho alguna que establezca o al menos aluda a algún daño concreto que hubiesen sufrido o pudiesen sufrir los peticionarios**, fuese leve o grave. El tribunal emitió el recurso extraordinario del *injunction* sólo por entender que el Alcalde carecía de autoridad para dictar las órdenes ejecutivas impugnadas, **sin identificar de modo alguno** cuáles eran los daños sufridos por los peticionarios, o en riesgo de sufrir, que el *injunction* habría de conculcar. Mas aun, **tampoco se hizo expresión alguna** en dicha sentencia que reflejara que el foro de instancia ponderó la naturaleza de los derechos reclamados frente al valor y la utilidad social de la obra pública que se pretendía paralizar, como venía obligado a hacer en un caso como el de autos.

En resumen, ni de las alegaciones vagas de los peticionarios ni de las determinaciones y conclusiones del foro de instancia surge un cuadro que demuestre la existencia de un agravio de patente intensidad a los derechos de los vecinos que requiriese urgente reparación mediante la expedición de un *injunction*. Ausente este elemento esencial, no procedía que se emitiera el *injunction* en cuestión. Véase, Mun. de Loíza v. Sucn. Marcial Suárez, res. el 11 de junio de 2001, 154 D.P.R. ___, 2001 T.S.P.R.

84, 2001 JTS 87; <u>Peña v. Federación de Esgrima de Puerto Rico</u>, 108 D.P.R. 147, 154 (1978). Mucho menos procedía que se dictara dicho *injunction* mediante una sentencia sumaria, dado que existía aquí una medular controversia sobre hechos esenciales. Véase, <u>Sánchez Montalvo v. Autoridad de Puertos</u>, res. el 7 de marzo de 2001, 153 D.P.R. ___, 2001 T.S.P.R. 30, 2001 JTS 34; <u>Mercado Vega v. U.P.R.</u>, 128 D.P.R. 273, 281 (1991); <u>Roig Com. Bank v. Rosario Cirino</u>, 126 D.P.R. 613, 617-618 (1990). Por ello también erraron los foros *a quo* al emitir y convalidar respectivamente la orden interdictal que aquí nos concierne.

V

Por los fundamentos expuestos, se dictará sentencia para revocar las del foro apelativo y del foro de instancia en el caso de autos.


Jaime B. Fuster Berlingeri
Juez Asociado

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Comité Pro Permanencia
de la Barriada Morales, Etc.

    Recurridos

      vs.                  CC-2001-588      Certiorari

Hon. William Miranda Marín
Municipio de Caguas

    Peticionarios

SENTENCIA

San Juan, Puerto Rico, a 16 de octubre de 2002.

Por los fundamentos expuestos en la Opinión que antecede, la cual se hace formar parte de la presente Sentencia, se revocan las del foro apelativo de 20 de junio de 2001 y del foro de instancia de 9 de febrero de 2001 en el caso de autos.

Lo pronunció, manda el Tribunal y certifica la Secretaria del Tribunal Supremo. El Juez Presidente señor Andréu García y los Jueces Asociados señores Rebollo López y Rivera Pérez no intervinieron.

Patricia Otón Olivieri
Secretaria del Tribunal Supremo