*523 SENTENCIA
Nos corresponde determinar si el Tribunal de Primera Instancia actuó conforme al derecho al emitir la sentencia de 15 de marzo de 2012, archivada en autos el 16 de ese mes. En ésta concluyó que la Comisión Estatal de Eleccio-nes de Puerto Rico (C.E.E.) incumplió con el Art. 3.015 de la Ley 78-2011, según enmendada, mejor conocida como el Código Electoral de Puerto Rico para el Siglo XXI (Código Electoral). Como consecuencia, el foro primario emitió un injunction preliminar y permanente en el que ordenó a la C.E.E. cesar y desistir de implementar el proceso de escru-tinio electrónico —encomendado por la Asamblea Legisla-tiva— para los procesos eleccionarios que han de cele-brarse el 6 de noviembre de 2012.
HH
El 25 de enero de 2012 el Ledo. Luis Ricardo Santini Gaudier (Santini Gaudier) presentó un recurso de entredi-cho preliminar y permanente contra la C.E.E. Posterior-mente, presentó una demanda enmendada contra la C.E.E. y los Comisionados Electorales de cada uno de los partidos políticos. En compendio, señaló que la C.E.E. incumplió con los requisitos dispuestos en el Código Electoral para implementar un sistema de escrutinio electrónico. Especí-ficamente alegó que la C.E.E. no publicó la resolución CEE-RS-11-174 en todas las juntas de inscripción perma-nente, en las alcaldías ni las colecturías, ni notificó a los partidos políticos, candidatos independientes u otras orga-nizaciones participantes del proceso.([1]) Además, indicó que tampoco publicó la CEE-RS-11-174 en dos periódicos de *524 circulación general por lo menos dos veces en el término de treinta días desde su aprobación. A su vez, sostuvo que la C.E.E. infringió su deber de notificar a la ciudadanía, se-gún impuesto en el Art. 3.015 del Código Electoral al no suministrar toda la información relacionada al escrutinio electrónico en el término de doce meses antes de la celebra-ción de las elecciones generales.
A base de sus alegaciones, el licenciado Santini Gaudier adujo que el incumplimiento con los requisitos de notifica-ción creó un ambiente de incertidumbre, desasosiego y des-información sobre el proceso de escrutinio electrónico que le afecta como candidato a las primarias por el Partido Popular Democrático y como elector, por lo cual sufriría un daño irreparable de no concederse el entredicho.!([2]) Adujo que el daño irreparable consistía en que no podría educar efectivamente en sus comparecencias públicas y privadas sobre las virtudes del sistema y la incertidumbre que ello acarrea. Además, señaló que era previsible que la C.E.E. no podría llevar a cabo una campaña de orientación a la ciudadanía con tiempo suficiente para no ocasionar un ver-dadero caos en las elecciones generales de 2012. Así las cosas, solicitó al Tribunal de Primera Instancia que emi-tiera una orden de injunction preliminar para que ese foro determinara si la C.E.E. cumplió con los requisitos estatu-tarios sobre la notificación requerida.
La C.E.E. se opuso a lo solicitado por el licenciado San-tini Gaudier. Sostuvo que el Art. 3.015 del Código Electoral y la Resolución Conjunta Núm. 44 —aprobada por ambos cuerpos legislativos y firmada por el Gobernador el 3 de junio de 2011— le obligaban a implantar un sistema de escrutinio electrónico. Señaló que la notificación de la CEE-RS-11-174 cumplió con lo requerido por el Código *525 Electoral. En ésta se informó sobre los aspectos del escru-tinio electrónico conforme surge de los documentos estipulados. ([3]) Además, la C.E.E. cuestionó la facultad del Tribunal de Primera Instancia para emitir el remedio de injunction permanente solicitado por el licenciado Santini Gaudier en contravención al mandato legislativo y ante la falta de un daño que requiera un remedio extraordinario.
Luego de evaluar las posturas de las partes, el Tribunal de Primera Instancia emitió la sentencia el 15 de marzo de 2012, archivada en autos al día siguiente. Concluyó que la C.E.E. incumplió insubsanablemente con los requisitos de notificación requeridos por el Art. 3.015 del Código Electoral y declaró “con lugar” la solicitud de injunction prelimi-nar y permanente. Como consecuencia, el foro primario or-denó a la C.E.E. cesar y desistir de implantar el sistema de escrutinio electrónico en los comicios de 2012 como método de escrutinio. Justificó su determinación al concluir que la información provista a los electores era escasa y que la C.E.E. no podría cumplir con lo requerido por el Código Electoral y la Resolución Conjunta Núm. 44 sin afectar el derecho al voto de los electores.
Al fundamentar su dictamen, el foro primario deter-minó que la notificación realizada era insuficiente, porque no contenía la compañía contratada, el costo, las máqui-nas, el programa que se utilizaría, se desconoce cómo se hará el voto o se coloca la papeleta, la certeza de la infor-mación y qué tipo de sistema se utilizaría. El Tribunal de Primera Instancia sostuvo que el licenciado Santini Gaudier sufre daño como elector al no sentirse seguro sobre el sistema que ha de utilizarse para escrutar los votos y la falta de información que existe sobre este. ([4])
*526 En su análisis, el foro primario examinó el derecho al voto y la notificación realizada por la C.E.E. Razonó que el Art. 3.015 del Código Electoral ordena a la C.E.E. determi-nar mediante resolución el sistema de escrutinio electró-nico que utilizará y establece cómo se debe notificar todo lo relacionado sobre este a la ciudadanía. Decretó que una vez la C.E.E. emita la resolución que establezca el sistema debe notificarla sin demora a todos los partidos políticos, candidatos independientes y organizaciones participantes por conducto de sus representantes y la exhibirá —en in-glés y español— en las oficinas de las juntas de inscripción permanente, alcaldías y colecturías. Además, la C.E.E. debe publicarla en no menos de dos periódicos de circula-ción general por lo menos en dos ocasiones en los treinta días desde su aprobación.
El foro primario concluyó que aunque la Resolución Conjunta Núm. 44 establece un término de por lo menos seis meses antes de la elección para que la C.E.E. regla-mente y oriente a la ciudadanía ello no tiene el efecto de enmendar las disposiciones contenidas en el Art. 3.015 del Código Electoral. Por tanto, el Tribunal de Primera Instan-cia determinó que la C.E.E. estaba obligada a cumplir con una notificación detallada de todo lo relacionado al escru-tinio electrónico con, por lo menos, doce meses antes de la elección. Dictaminó que el contenido de la resolución apro-bada y notificada por la C.E.E. no cumple con el mandato legislativo, debido a que esta recoge en esencia lo contenido en la Resolución Conjunta Núm. 44.([5])
Como consecuencia, el foro de instancia ultimó que era necesaria su intervención por encontrarnos ante un agra-vio de patente intensidad sobre el derecho al voto. Con-cluyó que, aunque las actuaciones de la C.E.E. son bajo la autoridad de una ley, procedía conceder el remedio de in *527 junction permanente. Señaló que era imposible que la C.E.E. lleve a cabo el mandato legislativo a los pocos meses de los eventos electorales y que la falta de exhibir la CEE-RS-11-174 en todas las alcaldías, las juntas de inscripción permanente y las colecturías ocasiona una desinformación a los electores y ciudadanos que puede impedir su ejercicio efectivo del voto en los comicios de 2012. Además, el foro primario indicó que la C.E.E. no ha puesto en vigor meca-nismos alternos como una campaña de orientación sobre el proceso, no ha determinado las máquinas, el procedimiento ni los programas que se usarán en ese proceso. Expresó que quedó convencido de que continuar con el proceso del sistema electrónico amenaza nuestro sistema democrático, ya que es perturbador que se descanse en un sistema des-conocido para el próximo evento electoral.
Inconforme, la C.E.E. acudió ante este Tribunal me-diante un recurso de certificación. En este cuestionó la de-terminación del Tribunal de Primera Instancia al indicar que erró el foro primario al concluir que la C.E.E. incum-plió con el Art. 3.015 del Código Electoral, al interpretarlo y al adoptar alegaciones concluyentes que dieron lugar al interdicto permanente ante un daño hipotético y especulativo. De esta forma, sostuvo que las actuaciones del foro primario impiden la consecución de un fin legisla-tivo legítimo como la implantación del escrutinio electrónico. La C.E.E. recalcó que cumplió con la notifica-ción requerida y su compromiso de que el sistema de escru-tinio electrónico no se implantaría sin corroborarse su fun-cionamiento y si este no funciona satisfactoriamente.
Posteriormente, el Comisionado Electoral del Partido Nuevo Progresista (Comisionado del P.N.P.), Ledo. Iván Cabán Soto, presentó su postura. En esta resaltó la nece-sidad de que se haga cumplir la intención legislativa, por lo que la interpretación de un estatuto es lograr que preva-lezca su finalidad. Adujo que la interpretación sobre un asunto requiere la integración de las expresiones de la Le- *528 gislatura ya sean contenidas en el estatuto o una resolu-ción conjunta cuyo carácter equivale al de una ley. El Co-misionado del P.N.P. expuso que la notificación de la CEE-RS-11-174 cumplió con las disposiciones contenidas en el Art. 3.015 del Código Electoral. Asimismo, indicó que cual-quier problema con la notificación a las alcaldías, juntas de inscripción permanente y colecturías puede ser subsanado por la C.E.E.
De otra parte, el Comisionado Electoral del Partido Popular Democrático, el Ledo. Eder Ortiz Ortiz, presentó su postura. Este argumentó que el foro primario no adoptó las alegaciones de la demanda presentada por el licenciado Santini Gaudier. Además, indicó que la C.E.E. incumplió con los requisitos exigidos por la Asamblea Legislativa para implantar un sistema de escrutinio electrónico. Para ello, argüyó que la C.E.E. incumplió con los requisitos con-tenidos en el Art. 3.015 del Código Electoral al no asegu-rarse de que la CEE-11-174 fuera publicada sin demora en las alcaldías, colecturías y juntas de inscripción perma-nente y tampoco notificó todo lo relacionado al escrutinio electrónico en el término de doce meses antes del evento electoral. Así las cosas, sostuvo que la sentencia emitida por el Tribunal de Primera Instancia debe ser confirmada.
Mediante resolución emitida el 13 de abril de 2012, este Tribunal declaró “con lugar” la certificación solicitada y or-denó al licenciado Santini Gaudier presentar su posición al recurso ante nos. Con el beneficio de la comparecencia de las partes, este Tribunal procede a atender este recurso.
II
A. En este caso se cuestiona la orden de interdicto per-manente y de cese y desista emitida por el Tribunal de Primera Instancia contra la C.E.E. En aras de atender los planteamientos desde una visión práctica del derecho, co- *529 menzaremos con discutir la figura del interdicto perma-nente y luego el Código Electoral para poder determinar si el foro primario actuó correctamente al concluir que la C.E.E. incumplió con el Código Electoral y al emitir el re-medio que hoy nos atañe. Veamos.
No existe controversia en cuanto a que el interdicto o injunction constituye un procedimiento especial dirigido a proteger al promovente de daños irreparables a su propie-dad o a otros derechos mediante una orden que prohíba u ordene ejecutar determinados actos. Véanse: Asoc. Vec. V. Caparra v. Asoc. Fom. Educ., 173 D.P.R. 304 (2008); Reglas 57.1-57.7 de Procedimiento Civil, 32 L.P.R.A. Ap. V; Arts. 675-689 del Código de Enjuiciamiento Civil, 32 L.P.R.A. sees. 3521-3566. Al emitirse el interdicto se constituye un mandato judicial que requiere a una parte que haga o se abstenga de hacer, o que permita hacer, determinada cosa que infrinja o peijudique el de otra. 32 L.P.R.A. see. 3521.
El interdicto debe concederse con cautela, luego de que se demuestre su necesidad y que el tribunal realice un balance de conveniencias y equidades. Los criterios para con-ceder el interdicto preliminar exigen que solo se conceda en situaciones claras en que las actuaciones del demandado menoscaben o afecten el derecho que el demandante inte-resa proteger. Para ello, se considera la naturaleza de los daños, la irreparabilidad o existencia de un remedio ade-cuado en ley; la probabilidad de que la parte prevalezca en los méritos o que la causa se torne académica y el posible impacto sobre el interés público. Precisa señalar que al conceder un interdicto permanente también requiere la consideración de la mayor parte de estos criterios. Véanse: Com. Pro Perm. Bda. Morales v. Alcalde, 158 D.P.R. 195, 205 (2002); Mun. de Loíza v. Sucns. Suárez et al., 154 D.P.R. 333, 366-368 (2001); P.R. Telephone Co. v. Tribunal Superior, 103 D.P.R. 200, 202 (1975); D. Rivé Rivera, El injunction en Puerto Rico, 53 Rev. Jur. U.P.R. 341, 354 et seq. (1984).
*530 El interdicto permanente se produce por una sentencia final. Los factores que los tribunales deben considerar al momento de emitir un interdicto permanente son: (1) si el demandante ha prevalecido en el juicio en sus méritos; (2) si el demandante posee algún remedio adecuado en ley; (3) el interés público involucrado, y (4) el balance de equidades. Plaza Las Américas v. N & H, 166 D.P.R. 631, 644 (2005); Universidad del Turabo v. L.A.I., 126 D.P.R. 497, 505 (1990).
El Art. 678 del Código de Enjuiciamiento Civil, 32 L.P.R.A. see. 3524, establece los casos en los cuales está prohibido conceder un injuntion o una orden de entredicho. En lo particular, dispone que no podrá expedirse el reme-dio extraordinario para impedir la aplicación u observan-cia de cualquier ley, o el cumplimiento de cualquier actua-ción autorizada por la Asamblea Legislativa, a menos que mediante sentencia final y firme la ley o la actuación au-torizada sea declarada inconstitucional o inválida. Cual-quier injunction emitido sin que se cumplan estas circuns-tancias es nulo e inefectivo. Ahora bien, el foro primario podrá dictar el interdicto en estos casos si ello es necesario para hacer efectiva su jurisdicción y evitar un daño irreparable, o cuando se alegue que se está privando a la parte peticionaria de algún derecho o privilegio protegido por la constitución o las leyes. En ese momento, el tribunal de-berá considerar el interés envuelto y concluir que la parte peticionaria tiene la posibilidad real de prevalecer en los méritos. La orden solo tendrá vigor en el caso específico y entre las partes. 32 L.RR.A. see. 3524(3).
El citado Art. 678 del Código de Enjuiciamiento Civil, es conocido como la Ley Anti-injunction. Este respondió al propósito de mantener la uniformidad y organización del proceso de gobierno, impidiendo la diversidad de opiniones sobre la constitucionalidad de las leyes. Exposición de Mo-tivos de la Ley Núm. 1 de 25 de febrero de 1946 (1946 Leyes de Puerto Rico 1, 3). El precepto angular del estatuto *531 es la presunción de constitucionalidad de las leyes, hasta tanto sean declaradas nulas por sentencia final, firme, inapelable e irrevisable. Asoc. Maestros de P.R. v. Torres, 136 D.P.R. 742, 748-749 (1994). Así, una parte no podrá acudir a los tribunales para impedir la finalidad legislativa por el mero hecho de alegar un posible daño. Claro está, bajo determinadas circunstancias el tribunal podrá emitir el interdicto, pero para ello debe hacer un balance entre el interés público y lo reclamado por la parte peticionaria.
B. Los planteamientos ante nuestra consideración re-quieren que auscultemos el derecho al voto y las actuacio-nes de la C.E.E. a la luz del Código Electoral. En nuestra jurisdicción el derecho al voto está expresamente consa-grado en nuestra Constitución. Este constituye una de las más preciadas prerrogativas del pueblo. Mediante el voto, el pueblo ejerce su poder soberano y expresa su voluntad. Véanse: Ramírez de Ferrer v. Mari Brás, 144 D.P.R. 141, 173 (1997); P.I.P. v. C.E.E., 120 D.P.R. 580, 615 (1988). En Puerto Rico se reconoce que el derecho al sufragio es “universal, igual, directo y secreto”. See. 2 del Art. II de la Constitución del Estado Libre Asociado de Puerto Rico, L.P.R.A., Tomo 1, ed. 2008, pág. 278.
Nuestro sistema de gobierno delegó en la Rama Legis-lativa la potestad de establecer y reglamentar el proceso electoral. En lo pertinente, la See. 4 del Art. VI de nuestra Constitución, L.P.R.A., Tomo 1, ed. 2008, pág. 425, esta-blece que:
Se dispondrá por ley todo lo concerniente al proceso electoral y de inscripción de electores, así como lo relativo a los partidos políticos y candidaturas.
En atención a esta delegación de poder, la Asamblea Le-gislativa aprobó el Código Electoral como una legislación básica de carácter y aplicación general en todo lo concer-niente a los procesos electorales. El nuevo Código Electoral responde a la necesidad de ajustar la ley electoral a la ex- *532 periencia de vida, clarificar términos, mejorar su redacción y corregir sus interpretaciones para facilitar y ampliar el ejercicio del derecho al voto. A su vez, se garantiza la ex-presión electoral a través del voto mediante un proceso puro que permite al elector participar y que su voto cuente de la forma en que fue emitido. Véanse: Exposición de Mo-tivos del Código Electoral; Art. 2.001 del Código Electoral. De esta forma, nuestra Asamblea Legislativa se ha preocu-pado por cumplir con el mandato constitucional.
En los asuntos de mayor relevancia que incluyó el nuevo Código Electoral es que se establece e instituye en Puerto Rico un sistema de votación electrónica para agilizar y fa-cilitar al elector el proceso de votación con las mayores garantías de confiabilidad. A los fines de lograr este obje-tivo, los legisladores facultaron y delegaron en la C.E.E. la planificación, organización, estructuración, dirección y su-pervisión del organismo electoral y de los procedimientos en cualquier elección que vaya a celebrarse. Art. 3.002 del Código Electoral. Entre las funciones, los deberes y las fa-cultades delegadas a la C.E.E. se encuentra la siguiente:
(o) iniciar y desarrollar un plan para la implementación de un sistema de votación, escrutinio o ambos utilizando medios elec-trónicos, en el cual el elector mantenga el control de la papeleta e interactúe con el dispositivo electrónico y su votación sea de-bidamente guardada; la Comisión previo análisis determinará cuál sistema electrónico será implementado; el mismo deberá comenzar no más tarde de noventa (90) días luego de apro-barse esta Ley, y deberá incluir, pero sin que se considere una limitación, una proyección económica del costo de implanta-ción escalonada o inmediata, de manera que la C.E.E. pueda hacer la solicitud presupuestaria que será ingresada en el fondo creado para ese fin. (Énfasis suplido). Art. 3.002(o) del Código Electoral.
Con relación al sistema de votación, el Código Electoral estableció en su Art. 3.015 como sigue:
La Comisión determinará mediante resolución, la forma del proceso de votación electrónica o escrutinio electrónico a ser usado en todos los colegios electorales. El elector tendrá pose- *533 sión y control de la o las papeletas por él votadas, ya sean electrónicas o de papel, hasta que mediante su interacción directa con la máquina de votación o escrutinio electrónico sus votos hayan sido debidamente registrados y sus papeletas guardadas en una urna electrónica o convencional. La Comi-sión notificará a la ciudadanía con no menos de doce (12) me-ses de antelación a la fecha de una elección general todo lo relacionado a la votación electrónica o escrutinio electrónico. La Oficina de Gerencia y Presupuesto identificará los fondos necesarios para el establecimiento del sistema de votación electrónica o escrutinio electrónico, según sea el caso.
Para una elección especial, la determinación del sistema de votación que se usará en los colegios de votación la tomará la Comisión o la Comisión Especial, según sea el caso, con no menos de sesenta (60) días antes de dicha elección. En los casos de referéndum, consulta o plebiscito se actuará conforme lo disponga su ley habilitadora, en caso que nada se disponga, se actuará como si fuera una elección especial. Toda elección que se celebre al amparo de esta Ley deberá llevarse a cabo en colegio abierto. Una vez aprobada la resolución estableciendo el sistema de votación o escrutinio utilizando medios electróni-cos, la Comisión sin demora notificará dicha determinación a los partidos políticos, candidatos independientes u organiza-ciones participantes por conducto de sus representantes. Ade-más, exhibirá dicha resolución, en español e inglés, en las ofi-cinas de las juntas de inscripción permanente, así como en todas las alcaldías y colecturías de rentas internas. De igual modo, la Comisión publicará la resolución, en español e inglés, en no menos de dos (2) periódicos de circulación general, por lo menos dos (2) veces durante el período de tiempo comprendido dentro de los treinta (30) días posteriores a la fecha de la apro-bación de la misma.
El sistema de votación o escrutinio electrónico que apruebe la Comisión proveerá para una votación secreta, no concederá o impondrá ventajas o desventajas a partido político o candi-dato alguno y no producirá condiciones onerosas a ningún elector o grupo de electores. Además, deberá garantizar que el elector pueda votar mediante una marca o indicación dentro del espacio donde aparezca la representación gráfica de la insignia de un partido o el nombre o emblema de un candidato o agrupación de ciudadanos certificada por la Comisión. La Co-misión respetará la intención clara y evidente del elector para que su voto sea contado correctamente y a tales fines el mé-todo de votación y formato de la papeleta será diseñado de manera que para el elector sea sencillo, obvio y libre de ambi-güedad dónde y cómo hacer su marca o indicación de selección *534 por el candidato o partido de su preferencia en los idiomas español e inglés. La Comisión adoptará los instrumentos o mé-todos tecnológicos necesarios que garanticen el máximo grado de confiabilidad, validez, seguridad e interpretación correcta de la intención clara y evidente del elector.
La Comisión evaluará los sistemas de votación y de escruti-nio basados en los desarrollos tecnológicos y electrónicos más avanzados disponibles para su adopción en Puerto Rico y pre-sentará sus recomendaciones al respecto ante la Secretaría de cada cámara legislativa no más tarde del año siguiente a cada elección. Todo sistema de votación o de escrutinio que se en-saye o implante deberá hacer evidente al elector que se regis-tra su voto y que se adoptan las medidas para realizar un recuento manual en caso de ser necesario. (Enfasis suplido).
Al examinar los requisitos impuestos por el Art. 3.015 del Código Electoral, se destaca que el legislador requirió a la C.E.E. determinar mediante resolución la forma del pro-ceso del escrutinio electrónico. Además, le impuso el deber de notificar a la ciudadanía lo relacionado a ese proceso con no menos de doce meses antes de las elecciones generales. La resolución emitida por la C.E.E. debía publi-carse en inglés y español por lo menos en dos periódicos de circulación general en dos ocasiones en el periodo de treinta días desde que fuera aprobada. La resolución debía exhibirse en las alcaldías, colecturías de rentas internas y juntas de inscripción permanente. Para ello, el Art. 3.015 del Código Electoral no estableció un determinado término. Asimismo, la C.E.E. debía notificar sin demora a los parti-dos políticos, candidatos independientes u organizaciones participantes.
Posteriormente, y con el propósito de autorizar a la C.E.E. a desarrollar e implantar en los procesos electorales de 2012 el uso de un sistema de escrutinio electrónico am-bos cuerpos de la Asamblea Legislativa aprobaron el 3 de junio de 2011 la Resolución Conjunta Núm. 44 que contó con el aval del Gobernador. En esta se expuso que, desde el 2000, la C.E.E. ha usado de manera limitada y positiva en determinados colegios electorales el sistema de escrutinio electrónico para primarias estatales de los partidos políti- *535 cos, primarias presidenciales del Partido Republicano y elecciones especiales en distritos o municipios. De la Reso-lución Conjunta Núm. 44 surge que los métodos empleados han permitido un procesamiento seguro y rápido de los re-sultados electorales salvaguardando la naturaleza del voto secreto. Al autorizar a la C.E.E. para establecer el meca-nismo de escrutinio electrónico, la Asamblea Legislativa ordenó la adopción e implantación de este para los eventos electorales del 2012. Al hacerlo la Resolución Conjunta Núm. 44 estableció, en lo pertinente, como sigue:
Sección 2. — La Comisión aprobará, según la Ley Electoral vigente, los reglamentos aplicables y los procedimientos a es-tablecer y hará uso del equipo adecuado y el apoyo técnico indispensable para garantizar que el método de dilución que determine la Comisión Estatal de Elecciones tenga una base de electores y escenario de votación que cumplan con el requi-sito de al menos una máquina de escrutinio electrónico por cada colegio de votación; que cada elector que participe de los procesos descritos en la Sección 1, emita su voto con privaci-dad e independencia; que se cuente cada sufragio en la forma y manera en que fue votado; y que se asegure y proteja evidencia verificable de los votos, en caso de recuento. Asimismo, la Co-misión Estatal de Elecciones establecerá en la reglamentación pertinente los estatutos y parámetros para llevar a cabo pro-gramas de educación masiva y campaña de orientación diri-gida a los electores sobre el sistema de escrutinio electrónico en fecha que no será menos de seis (6) meses antes del evento electoral. (Énfasis suplido).
La Resolución Conjunta Núm. 44 refleja que el legisla-dor contempló el tiempo necesario para informar y educar masivamente a los electores en un término de seis meses antes del evento electoral. Como se sabe, nuestra constitu-ción establece que “se determinarán por ley los asuntos que puedan ser objeto de consideración mediante resolu-ción conjunta, pero toda resolución conjunta seguirá el mismo trámite de un proyecto de ley”. Art. Ill, Sec. 18, Const. E.L.A., Tomo 1, ed. 2008, pág. 399. La Ley sobre Aprobación, Promulgación y Distribución de Leyes y Otros Documentos, 2 L.P.R.A. see. 181 et seq., en su Ley Núm. 2 *536 de 4 de marzo de 1953 (2 L.P.R.A. secs. 200-201) (Ley Núm. 2), reglamenta lo relativo a la aprobación de las leyes y resoluciones conjuntas. En cuanto a estas últimas, dis-pone que:
Toda legislación que haya de perder su fuerza al realizarse la obra, o cumplirse la finalidad que persigue, será objeto de consideración por la Asamblea Legislativa mediante resolu-ción conjunta y no formará parte de los estatutos permanentes de Puerto Rico. Estas resoluciones seguirán el mismo trámite que los proyectos de ley. Se excluyen aquellos casos en que la materia que deba considerarse como resolución conjunta sea parte necesaria, aunque incidental, de una materia principal que deba considerarse mediante proyecto de ley. 2 L.P.R.A. see. 200.
Así expuesto, las resoluciones conjuntas tienen una du-ración limitada que deben cumplir con los mismos trámites de un proyecto de ley, por lo que estas tienen el carácter de las leyes. Véanse: C.R.I.M. v. Méndez Torres, 174 D.P.R. 216, 229 (2008); Noriega v. Hernández Colón, 135 D.P.R. 406, 450 (1994); Op. Sec. Just. Núm. 11 de 1973. De tal relevancia es lo dispuesto mediante resoluciones conjuntas que la Ley Núm. 2, supra, provee para que ninguna me-dida sea declarada inválida por haberse aprobado me-diante este mecanismo en vez de una ley o a la inversa. 2 L.P.R.A. see. 201.
Lo anterior refleja que tanto la ley como las resoluciones conjuntas contienen la misma fuerza debido a que recogen el mandato o propósito específico legislativo por el cual se crearon. Solamente la Asamblea Legislativa puede variar o derogar lo dispuesto mediante estas. Es el deber de los tribunales velar para que se cumpla con la disposición legislativa. Para ello, acudimos a una regla de interpreta-ción que es absolutamente invariable y que consiste en ha-cer cumplir la verdadera intención y deseo del Poder Legislativo. Al descargar nuestra función debemos siempre considerar cuáles fueron los principios perseguidos por la Asamblea Legislativa al aprobarla, de forma tal que ase- *537 guremos el resultado que originalmente se quiso obtener. Una vez se descubre el deseo y la voluntad del legislador el fin de la interpretación ha sido logrado y resulta innecesa-rio aplicar reglas de hermenéutica. Yiyi Motors, Inc. v. E.L.A., 177 D.P.R. 230, 249 (2009); Dorante v. Wrangler of P.R., 145 D.P.R. 408, 417 (1998). Véase, además, R.E. Bernier y J.A. Cuevas Segarra, Aprobación e interpretación de las leyes en Puerto Rico, San Juan, Pubs. JTS, 1987, págs. 241-242. Por lo tanto, los tribunales estamos compelidos a interpretar las leyes, teniendo presente el propósito social que las inspiró, dándoles un sentido lógico a sus diversas disposiciones y supliendo las deficiencias cuando ello sea inevitable. Cualquier exégesis que resulte absurda al pro-pósito por el cual fue creado el estatuto debe ser rechazada. Sucn. Álvarez v. Srio. de Justicia, 150 D.P.R. 252, 274 — 275 (2000).
De las disposiciones legales citadas se colige que la fina-lidad legislativa consiste en establecer el sistema de escru-tinio electrónico para el evento electoral de 2012 salva-guardando el derecho al voto de los electores. Para ello, la Asamblea Legislativa contempló el tiempo necesario que se requiere para informar sobre la implantación del sistema y lo relacionado a esta, así como para educar a la ciudadanía sobre sus particulares. A esos efectos, mediante la Resolu-ción Conjunta Núm. 44, el legislador estableció que bas-taba con un término de seis meses antes de las elecciones para instruir a la ciudadanía sobre el procedimiento del escrutinio electrónico. Los tribunales no podemos sustituir el criterio del legislador por el nuestro. Por otra parte, el Art. 3.015 del Código Electoral rige el procedimiento de aprobación y notificación de la resolución mediante la cual la C.E.E. implantaría el proceso de escrutinio electrónico.
No cabe duda de que las actuaciones de la Asamblea Legislativa procuran establecer con primordial importan-cia un sistema de escrutinio electrónico que no ponga en riesgo la confiabilidad al proceso ni vulnere el derecho del *538 elector al sufragio universal, al voto secreto y la libre de coacción. Al mismo tiempo que se reiteran las garantías de un proceso electoral que refleje una pureza procesal en nuestro sistema democrático.
III
En resumen, la C.E.E. argumentó que el foro primario recogió como determinaciones las alegaciones no probadas del licenciado Santini Gaudier sin analizar la controversia medular de derecho en este caso. Argüyó que el Tribunal de Primera Instancia concedió unos remedios sin que se de-mostrara la posibilidad de un daño concreto y al asumir que estos se causarían sin exponer cómo las actuaciones de la C.E.E. violan o restringen el derecho al voto. Además, la C.E.E. señaló que erró el foro primario al determinar que incumplió con la notificación requerida por el Art. 3.015 del Código Electoral. La C.E.E. expresamente nos señaló que el hecho de que no haya podido finalizar el proceso de ne-gociación con la compañía seleccionada no significa que proseguirá con su implantación si alberga duda en cuanto a su funcionamiento. Nos remite a la CEE-RS-11-231 de 14 de noviembre de 2011, la CEE-RS-12-01 de 5 de enero de 2012 y la CEE-RS-12-02 de 16 de enero de 2012 para re-cordar que su compromiso es implantar un escrutinio que no afecte de modo alguno el derecho al voto en el que el foro primario basa su determinación de conceder el interdicto permanente. ([6])
*539 En cuanto a los planteamientos relacionados con las de-terminaciones del Tribunal de Primera Instancia, estas go-zan de deferencia, por lo que en ausencia de un reclamo específico por la C.E.E. no intervendremos con la aprecia-ción de la prueba realizada por el foro primario. Claro está, esa deferencia no se extiende a las conclusiones de derecho subsumidas e identificadas erróneamente como determina-ciones de hecho. Así nos remitiremos a revisar si la deter-minación del foro de instancia con relación a que la C.E.E. incumplió con el Art. 3.015 del Código Electoral y la Reso-lución Conjunta Núm. 44 es correcta en derecho y si proce-día que ese foro emitiera el interdicto permanente.
Un análisis desapasionado de la disposición del Tribunal de Primera Instancia refleja que esta responde a su apreciación de que la C.E.E. incumplió con el mandato le-gislativo por entender que no notificó todo lo relacionado al proceso de escrutinio electrónico en el término de doce me-ses antes de la elección general. Ultimó que la C.E.E. no podía subsanar sus actuaciones. Para justificar su deci-sión, el foro primario determinó que la Resolución Con-junta Núm. 44 no enmendó el término de doce meses esta-blecido en el Art. 3.015 del Código Electoral. Entendió que el Código Electoral obligaba a la C.E.E. a notificar sobre todos los aspectos del escrutinio electrónico. Estimó que era imposible que la C.E.E. cumpliera con el mandato le-gislativo en los meses que restan antes de las elecciones generales. Igualmente, supuso como un hecho que la C.E.E. implantaría un sistema que atentaría contra el de- *540 recho al voto de los electores sin cumplir con su enco-mienda y sin corroborar su funcionamiento, por lo que en-tendió necesario emitir el interdicto permanente.
De la discusión previamente reseñada surge indiscuti-blemente que la interpretación realizada por el Tribunal de Primera Instancia demuestra que impuso a la C.E.E. re-quisitos adicionales a los contemplados por el Código Electoral y la Resolución Conjunta Núm. 44. El tribunal de' instancia descartó la intención y el deseo legislativo al in-terpretar y requerir literalmente la publicación de toda la información relacionada con el escrutinio electrónico. Los requisitos impuestos por el foro primario van dirigidos a aspectos técnicos del proceso que en nada afectan el dere-cho de la ciudadanía con relación a su sufragio. Más aún, el foro de instancia pretendió que la C.E.E. notificara porme-nores que a ese momento no habían sido adjudicados por ese organismo. De esta forma, dejó de considerar el propó-sito social que inspiró la ley y no le impartió un sentido lógico a sus disposiciones. Cuando el foro primario ultimó que la C.E.E. no podría finiquitar su encomienda sin per-judicar el derecho al voto de los electores, en efecto pasó juicio sobre el término dispuesto por la Asamblea Legisla-tiva mediante la Resolución Conjunta Núm. 44 y de facto lo sustituyó por el suyo propio para justificar su intervención. Además, obvió las expresiones recogidas en las distintas resoluciones emitidas por la C.E.E. de las cuales surge un compromiso que demuestra que no se implantará un sis-tema electrónico de tener cualquier duda o desconfianza en éste y sin pasar las pruebas de aceptación que serán corro-boradas por los representantes de todos los partidos políticos.
La lectura de la CEE-RS-11-174 aprobada el 4 de no-viembre de 2011 por la C.E.E. para implantar un sistema de escrutinio electrónico cumple con los requisitos impues-tos por fíat legislativo. Mediante esta se informó doce me-ses antes del evento electoral lo relacionado con el escruti- *541 nio electrónico a los electores. La CEE-RS-11-174 notificó que: (1) el voto continuará mediante una marca en una papeleta de papel; (2) los votos se contarán utilizando un lector óptico y las papeletas se depositarán en una urna; (3) el voto se llevará a cabo mediante una interacción directa del elector con la máquina electrónica; (4) el sistema garantizará que el voto sea privado e independiente para que cada voto cuente en la forma como se realizó; (5) el sistema notificará al elector si emitió un voto válido y ofre-cerá la oportunidad para corregir cualquier error que pu-diera invalidarlo; (6) las papeletas serán depositadas en una urna adherida a la máquina para protegerlas como evidencia verificable en caso de escrutinio o recuento manual; (7) la C.E.E. promulgará la reglamentación necesaria para llevar a cabo un programa de educación masiva y campaña de orientación dirigida a los electores sobre el sistema de escrutinio electrónico con por lo menos seis me-ses antes de las elecciones generales.
Los hechos determinados y recogidos en la sentencia emitida por el Tribunal de Primera Instancia demuestran que la CEE-RS-11-174 fue aprobada el 4 de noviembre de 2011 y que esta fue publicada —en inglés y español— en El Nuevo Día y en El Vocero de Puerto Rico los días 6 y 13 de noviembre de 2011, es decir, durante el término de treinta días dispuesto en el Art. 3.015. Asimismo, surge que esta fue comunicada sin demora a los partidos políticos, candi-datos independientes u otras organizaciones. Además, la C.E.E. remitió, mediante mensajero el 9 de noviembre de 2011, al Secretario de Hacienda la CEE-RS-11-174 para su publicación en las colecturías de rentas internas y que el señor Nelson Alvarado certificó que la envió por facsímil a las juntas de inscripción permanente. Existe evidencia de que 24 de las 104 juntas de inscripción permanente fueron notificadas. El foro primario determinó que no existe evi-dencia de que se notificó a las alcaldías ni que se indicó a estos que debían publicar la resolución. No obstante, no *542 determinó que la C.E.E. no hubiera notificado a las alcaldías. De no haberse exhibido o notificado la CEE-RS-11-174 a todas las colecturías, alcaldías o juntas de inscrip-ción permanente no vemos razón alguna para concluir —como lo hizo el foro primario— que ello es insubsanable. Recordamos que el Art. 3.015 del Código Electoral no fija un término para que las alcaldías, colecturías y juntas de inscripción permanente exhiban la CEE-RS-11-174.
Juzgamos que, al emitir la CEE-RS-11-174, la C.E.E. cumplió con los requisitos impuestos por el Código Electoral y la Resolución Conjunta Núm. 44. No podemos avalar la interpretación literal y aislada que realizó el Tribunal de Primera Instancia. La sentencia emitida por el foro prima-rio no responde a la intención legislativa plasmada en ese estatuto ni recogida en la Resolución Conjunta Núm. 44. La sentencia del foro primario presume —sin prueba o base alguna— que la C.E.E. aprobará un sistema que no responda al mandato legislativo que produzca o interfiera con el derecho al voto.
Al momento de emitir el dictamen ante nuestra conside-ración, la C.E.E. desempeñaba lo ordenado por la Asam-blea Legislativa para implantar un sistema de escrutinio electrónico para las elecciones de 2012. La C.E.E. no lo había instaurado. Para ello, la C.E.E. está obligada a cum-plir con los requisitos establecidos en el Código Electoral, la Resolución Conjunta Núm. 44 y las expresiones recogi-das en las resoluciones emitidas por la propia C.E.E.
Una vez determinado que la C.E.E. cumplió con los re-quisitos establecidos por el Art. 3.015 del Código Electoral y la Resolución Conjunta Núm. 44 resulta claramente im-procedente la expedición del interdicto permanente para impedirle cumplir con la observancia de la ley según la actuación autorizada por la Asamblea Legislativa. No es-tamos ante el cuestionamiento de que esa delegación es inconstitucional o inválida. Tampoco era necesario que el Tribunal de Primera Instancia hiciera efectivo el interdicto *543 para proteger el derecho al voto del licenciado Santini Gaudier o el de cualquier elector. A este momento, no existe posibilidad alguna de que las acciones de la C.E.E. enca-minadas a cumplir con las delegaciones de la Asamblea Legislativa conlleven un daño al derecho del sufragio reco-nocido en nuestro sistema. Tal conclusión es una alta-mente especulativa y a destiempo. Más aún, constituye una adjudicación sobre lo decretado por la Asamblea Legis-lativa al aprobar la Resolución Conjunta Núm. 44, estable-ciendo un término de tan solo seis meses para orientar e informar a la ciudadanía sobre los procesos electorales re-lacionados con el escrutinio electrónico. Por lo tanto, el Tribunal de Primera Instancia erró al emitir el interdicto per-manente y la orden de cese y desista en el caso ante nuestra consideración.
IV
Por los fundamentos expuestos, este Tribunal revoca la sentencia emitida por el Tribunal de Primera Instancia.

Notifíquese inmediatamente por teléfono, facsímil y por la vía ordinaria.

Así lo pronunció, manda el Tribunal y certifica la Secre-taria del Tribunal Supremo. El Juez Asociado Señor Mar-tínez Torres emitió una opinión de conformidad, a la cual se unió la Jueza Asociada Señora Pabón Charneco. El Juez Presidente Señor Hernández Denton hizo constar la expre-sión siguiente:
Entiendo que la Comisión Estatal de Elecciones no cumplió plenamente con su deber de notificar a la ciudadanía “todo lo relacionado” al escrutinio electrónico con al menos doce meses de antelación a la fecha de la elección general, según estable-cido por el Art. 3.015 del Código Electoral de Puerto Rico para el Siglo XXI. Como señala la Juez Asociada Señora Rodríguez Rodríguez en su opinión disidente, reproducir mecánicamente el contenido de varias disposiciones del Código Electoral sobre *544 este tema en una resolución administrativa, sin más, no se adhiere al mandato legislativo de notificar “todo lo relaciona-do” al escrutinio electrónico en ese plazo. Por otro lado, no comparto el análisis de una mayoría de este Tribunal en cuanto al efecto modificativo que una Resolución Conjunta pueda tener sobre una ley que forma parte de los estatutos permanentes de nuestro ordenamiento. No obstante lo anterior, opino que la acción que origina el recurso de autos no cumple con los requisitos esenciales para que proceda un injunction que paralice la aplicación u observancia de una ley que ha sido válidamente aprobada por la Asamblea Legislativa. En particular, entiendo que el incumplimiento de un mandato legislativo por parte de una agencia administra-tiva llamada a implantarlo no conlleva —en este caso— la suspensión de ese mandato. Más aún, los daños alegados por el demandante y el incumplimiento de la Comisión son en todo caso subsanables, pues existen otros remedios adecuados en ley para repararlos. Por ejemplo, el propio Código Electoral reconoce un remedio de revisión judicial y existe la posibilidad de presentar una acción de mandamus para sujetar la actua-ción administrativa al mandato legislativo. Por último, cabe recalcar que este caso no versa ni resuelve varios asuntos de interés público, tales como las controversias sobre la adjudica-ción de la subasta y la contratación para implantar el escruti-nio electrónico. Actualmente existen otros recursos presenta-dos ante el Tribunal de Primera Instancia que no están ante la consideración de este Tribunal y atienden esas controversias. Por todo lo anterior, concurro con el resultado de la Sentencia del Tribunal.
La Jueza Asociada Señora Fiol Matta concurrió con el resultado al entender, por las razones expuestas por el Juez Presidente Señor Hernández Denton, que el recurso presentado por el licenciado Santini Gaudier no cumple con los requisitos para que se emita un injunction que pa-ralice las acciones de la Comisión Estatal de Elecciones en cumplimiento con lo dispuesto en el Código Electoral. La Juez Asociada Señora Rodríguez Rodríguez disintió con una opinión escrita.
(Fdo.) Aida Ileana Oquendo Graulau

Secretaria del Tribunal Supremo

*545 — o —

(1) El 4 de noviembre de 2011, la Comisión Estatal de Elecciones (C.E.E.) emitió la CEE-RS-11-174: Resolución de Aviso de Sistema de Votación, Sistema de Escruti-nio Electrónico conocido como Optical Scanning System. (OpScan).

(2) Las primarias fueron celebradas el 18 de marzo de 2012, por lo que resulta innecesario que este Tribunal dilucide los planteamientos relacionados en cuanto a este particular. Al momento en que el Tribunal de Primera Instancia emitiera la sentencia objeto del presente recurso resultaba patente que la C.E.E. no implantaría el escrutinio electrónico para ese evento electoral.

(3) Las partes estipularon la CEE-RS-11-174 y su publicación en español e in-glés en los periódicos El Nuevo Día y El Vocero de Puerto Rico el 6 y 13 de noviembre de 2011, es decir, en el término de treinta días desde su aprobación.

(4) Además, indicó que sufre daño irreparable como candidato a senador por acumulación, debido a que no puede adiestrar e instruir a sus funcionarios sobre el sistema de escrutinio electrónico. Véase el esc. 2.

(5) El Tribunal de Primera Instancia indicó que tampoco se establecieron los procedimientos para la participación de los electores con impedimentos.

(6) La CEE-RS-11-231 de 14 de noviembre de 2011, pág. 13, dispone:
“En cuanto a la confiabilidad del sistema de escrutinio electrónico que se pre-tende utilizar en las próximas Elecciones Generales, no debemos olvidar que el mismo se llevará a cabo únicamente si el mismo pasa todas las pruebas de aceptación de fábrica, en donde se corroborará su funcionamiento por representantes de todos los partidos políticos inscritos. El Pueblo de Puerto Rico debe tener la confianza de que seremos los primeros en levantar nuestra voz si entendemos que el equipo o la pro-gramación no funciona satisfactoriamente, y no daremos paso a la utilización del mismo”. (Énfasis suplido y en el original).
A su vez, la CEE-RS-12-01 de 5 de enero de 2012, pág. 11, establece que:
*539 “Reiteramos, además que si albergáramos cualquier duda en cuanto al funcio-namiento del equipo o de la programación del sistema de escrutinio electrónico no daremos paso a la utilización del mismo”.
De otra parte, la CEE-RS-12-02 de 16 de enero de 2012, pág. 4, dispone como sigue:
“Según hemos señalado reiteradamente, la selección de esta compañía sólo quiere decir que se comenzará con un proceso de negociación que tiene que ser acep-table para la CEE y para el Pueblo de Puerto Rico. La CEE no permitirá que se suscriba ningún contrato que no proteja celosamente cada centavo de dinero público que se invierta en eseproyecto y la confianza de nuestro Pueblo en su sistema electoral”.